**Alvis Kent WALDREP, Jr., Appellant,**

v.

**TEXAS EMPLOYERS INSURANCE ASSOCIATION, in Receivership; and Texas Property and Casualty Insurance Guaranty Association, Appellees.**

No. 03–98–00053–CV.

Court of Appeals of Texas, Austin.

June 15, 2000.

Rehearing Overruled July 27, 2000.

694

John E. Collins, Dallas, for appellant.

Greg Whigham, Mullen, Macinnes & Redding, Austin, for Appellees.

Before Justices KIDD, YEAKEL and POWERS.*

LEE YEAKEL, Justice.

Appellant Alvis Kent Waldrep, Jr. was awarded workers' compensation benefits by the Texas Workers' Compensation Commission (the "Commission") for an injury he sustained while playing football for Texas Christian University ("TCU"). Appellee Texas Employers Insurance Association, in receivership, Texas Property and Casualty Insurance Guaranty Association appealed the award to the district court.[1] Following a trial *de novo*,[2] a jury found that Waldrep had failed to prove that he was an employee of TCU at the time of his injury. The district court rendered judgment that Waldrep take nothing against TEIA. Waldrep appeals the judgment, claiming that (1) he was an employee as a matter of law and (2) the district court erred in admitting and excluding certain evidence at trial. We will affirm the district court's judgment.

## BACKGROUND

Waldrep graduated from high school in Alvin, Texas in 1972. During his junior and senior years, TCU was among many schools interested in recruiting Waldrep, a young man known for his athletic ability as well as his good academic record. Tommy Runnels, a TCU assistant football coach, visited Waldrep frequently at his home and school, attempting to interest Waldrep in TCU's football and academic programs. During one home visit, Waldrep's mother asked Runnels what would happen if Waldrep were injured during his football career at TCU. Runnels assured Waldrep and his family that TCU would "take care of them" and emphasized that Waldrep would keep his scholarship even if he were injured and could not play football.

Waldrep was very impressed with the facilities at TCU and believed that his abilities would fit in well with TCU's football program. He was also aware that recruitment and his future involvement in athletics at TCU were governed by the rules of the Southwest Athletic Conference

---

* Before John E. Powers, Senior Justice, (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1. Texas Employers Insurance Association ("TEIA") was an association of Texas employers that insured payment of compensation to employees who sustained injuries in the course of their employment by TEIA subscribers. A subscriber was an employer who became a member of TEIA by paying TEIA insurance premiums. *See* Act of May 12, 1959, 56th Leg., R.S., ch. 355, § 1, 1959 Tex. Gen. Laws 778 (Tex.Rev.Civ. Stat. Ann. art. 8309, § 1, since repealed by Act of December 11, 1989, 71st Leg., 2d C.S., ch. 1, § 16.01(15), 1989 Tex. Gen. Laws 114). The district-court pleadings state that Texas Property and Casualty Insurance Guaranty Association is the statutory successor to TEIA. It is undisputed that at all times relevant to the determination of the issues before us, TCU was a TEIA subscriber. Because the interests of TEIA and its successor do not diverge, we will refer to appellee as TEIA.

2. *See* Tex. Lab.Code Ann. §§ 410.301–.308 (West 1996) (trial limited to issues that were before Commission); *Texas Workers' Compensation Comm'n v. Garcia*, 893 S.W.2d 504, 515 (Tex.1995) (Commission's final decision regarding compensability may be appealed to courts under modified *de novo* review limited to issues that were before Commission.).

("Southwest Conference")[3] and the National Collegiate Athletic Association ("NCAA"). To affirm his intent to attend school at TCU and participate in TCU's football program, Waldrep signed two documents. First, Waldrep signed a pre-enrollment form ("Letter of Intent"),[4] which demonstrated his formal desire to play football for TCU and penalized him if he decided to enter a different school within the Southwest Conference.[5] Waldrep later signed a financial aid agreement ("Financial Aid Agreement"),[6] ensuring that Waldrep's room, board, and tuition would be paid while attending TCU and that Waldrep would receive ten dollars per month

for incidentals. This cash payment was generally referred to as "laundry money." Both documents were contingent on Waldrep's meeting TCU's admission and scholastic requirements for athletic awards.

In August 1972, Waldrep enrolled at TCU. In October 1974, while playing football for TCU against the University of Alabama, Waldrep was critically injured. He sustained a severe injury to his spinal cord and was paralyzed below the neck. Today, Waldrep has no sensation below his upper chest. In 1991, Waldrep filed a workers' compensation claim for his injury.[7] The Commission entered an award in his favor. TEIA appealed this decision to

3. At the time, TCU was a member of the Southwest Conference. That athletic conference no longer exists.

4. The Letter of Intent provided in pertinent part:

This is to express my desire to participate in the athletic program at Texas Christian University and to certify my intention to enroll at that institution on August, 1972. My decision is subject to acceptance by this institution, the fulfillment of its admission requirements and scholastic requirement for athletic awards.

. . . .

Regulations and Procedures for Pre–Enrollment Applications.

. . . .

Financial aid is awarded by Southwest Conference members on the basis of a student-athlete's desire to participate in the athletic program of the institution making the award. By the signing of the Letter of Intent, the student-athlete pledges that he will participate to the best of his ability in the athletic program of the signing institution.
Southwest Athletic Conference, *Pre–Enrollment Application* (1972).

5. The document warns that Waldrep would not be eligible to play for another Southwest Conference institution during his freshman year at college and "the first year of varsity competition for which he would normally be eligible" if he signed with a different school. *See* Southwest Athletic Conference, *Pre–Enrollment Application* (1972).

6. The Financial Aid Agreement states:

This is to certify that [Alvis Kent Waldrep] will be awarded financial aid at Texas Chris-

tian University to the extent of room, board, tuition, fees, and $10 per month for incidentals.

The above award will be for the period . . . extending from August, 1972, to May, 1976 inclusive, and will not be canceled during this time except for failure of the student to comply with the rules and regulations of this institution and of the Southwest Athletic Conference. This award may be renewed during the period of the student's athletic eligibility.

. . . .

Both my parents . . . and I understand that my failure to meet the scholastic requirements for athletic awards, or the admission requirements of Texas Christian University by August 15, 1972 will render this agreement null and void.
Southwest Athletic Conference, *Financial Aid Agreement* (1972).

7. We note that although Waldrep was injured in 1974, this suit was not filed until 1993, giving rise to the question of whether the case may be time-barred. TCU did not file a report of Waldrep's injury with the Industrial Accident Board, the Commission's predecessor (*see* Act of December 11, 1989, 71st Leg., 2d C.S., ch. 1, § 17.01, 1989 Tex. Gen. Laws 115), immediately following the accident. *See* Tex.Rev.Civ. Stat. Ann. art. 8307, § 7, since repealed by Act of December 11, 1989, 71st Leg., 2d C.S., ch. 1, § 16.01(10), 1989 Tex. Gen Laws 114. In fact, TCU did not file a report with the Commission until 1991. When an "employer" has been given notice or has knowledge of an injury and fails to file a report of the injury, limitations does not begin to run until the report is filed. *See* Act of May 26, 1971, 62d Leg., R.S., ch. 993, § 1, 1971 Tex. Gen. Laws 3006, 3006–07 (Tex.Rev.Civ. Stat. Ann. art. 8307, § 7a, since repealed by

the district court. In a trial *de novo,* a jury found that Waldrep was not an employee of TCU at the time of his injury. The district court rendered judgment in favor of TEIA. On appeal, Waldrep presents five issues. The first addresses whether, as a matter of law, Waldrep was an employee of TCU.[8] The final four challenge various evidentiary rulings made by the district court.

## DISCUSSION

### Status as an Employee for Workers' Compensation Purposes

■ By his first issue, Waldrep asserts that at the time of his injury he was an employee of TCU *as a matter of law.* We begin by noting that Waldrep is attacking the legal sufficiency of an adverse answer to a jury question on which he had the burden of proof. After hearing all of the evidence, the jury declined to find that Waldrep was an employee of TCU at the time of his injury.[9] When reviewing a legal-sufficiency point of error that attempts to overcome an adverse jury finding as a matter of law, appellate courts must employ a two-prong test. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *Circle C Child Dev. Ctr., Inc. v. Travis Cent. Appraisal Dist.,* 981 S.W.2d 483, 485 (Tex.App.—Austin 1998, no pet.); *Oram v. State Farm Lloyds,* 977 S.W.2d 163, 168 (Tex.App.—Austin 1998, no pet.). First, we examine the record for evidence that supports the finding, considering only the evidence and inferences that lend support to the finding, while disregarding all evidence and inferences to the contrary. *See Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Sterner,* 767 S.W.2d at 690. If there is no evidence to support the finding, we then review the entire record to see if the con-

trary proposition is established as a matter of law. *See Sterner,* 767 S.W.2d at 690.

■ Our initial inquiry is whether the evidence is legally sufficient to support the jury's refusal to find that Waldrep was an employee of TCU. We will uphold the jury's finding if more than a mere scintilla of evidence supports it. *See Crye,* 907 S.W.2d at 499; *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987). A scintilla has been defined as "a barely perceptible manifestation," "the slightest particle or trace," and "a spark; a remaining particle; a trifle; the least particle." W. Wendell Hall, *Standards of Review in Texas,* 29 St. Mary's L.J. 351, 480 n. 858 (1998) (quoting *Webster's Third New International Dictionary* 2033 (Philip B. Gove ed., 1986) and *Black's Law Dictionary* 1207 (5th ed.1979)). Evidence amounts to more than a mere scintilla "when the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997) (citing *Crye,* 907 S.W.2d at 499 (quoting *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994))).

Therefore, the question presented to this Court is whether there is some evidence (more than a mere scintilla) supporting the jury's failure to find that Waldrep was an employee of TCU at the time of his injury. Stated another way, could any reasonable and fair-minded person conclude that Waldrep was not employed by TCU when injured? We answer this question affirmatively.

■ We are confronted with a situation novel to Texas jurisprudence: whether, for workers' compensation law purposes, a recipient of a scholarship or financial aid from a university becomes that university's employee by agreeing in return to partici-

---

Act of December 11, 1989, 71st Leg., 2d C.S., ch. 1, § 16.01(10), 1989 Tex. Gen. Laws 114).

**8.** Waldrep does not attack the factual sufficiency of the jury's finding.

**9.** The sole question submitted to the jury inquired, "At the time of his injury, was Alvis Kent Waldrep, Jr. an employee of Texas Christian University?" The jury was instructed to answer "Yes" or "No."

pate in a university-sponsored program. Cases decided under the various workers' compensation statutes in effect from time to time have almost uniformly determined the existence of an employer-employee relationship by an analysis of whether the claimant of workers' compensation benefits was an *employee* as distinguished from an *independent contractor. See, e.g., Thompson v. Travelers Indem. Co.,* 789 S.W.2d 277, 278 (Tex.1990); *Newspapers, Inc. v. Love,* 380 S.W.2d 582, 583 (Tex.1964). These authorities do not conveniently overlay the facts presented here, as there is no allegation that Waldrep was an independent contractor. Yet they are instructive in one significant aspect: one may receive a benefit from another in return for services and not become an employee.

■ The jury charge defined "employee" as "a person in the service of another under a contract of hire, express or implied, oral or written, whereby the employer has the right to direct the means or details of the work and not merely the result to be accomplished."[10] Thus, in failing to find that Waldrep was TCU's employee, the jury may have believed that there was no contract of hire between Waldrep and TCU or, if there was, it did not give TCU the right to direct the means

or details of Waldrep's "work." We will examine both possibilities.

### Existence of Contract of Hire

■ For the purpose of workers' compensation law, the employer-employee relationship may be created *only* by a contract. *See United States Fidelity & Guar. Co. v. Goodson,* 568 S.W.2d 443, 445–46 (Tex.Civ.App.—Texarkana 1978, writ ref'd n.r.e.). Waldrep strongly urges that the Letter of Intent and Financial Aid Agreement are express contracts of hire that set forth the terms of Waldrep's "employment." However, we do not find these documents to be so clear. At best, they only partially set forth the relationship between Waldrep and TCU. By their terms, they generally bound Waldrep to TCU to the exclusion of other Southwest Conference schools, if he intended to participate in athletics, and extended him financial aid so long as he complied with the admission and scholastic requirements of TCU and the rules and regulations of both TCU and the Southwest Conference. These requirements, rules, and regulations are not specifically described in either of the agreements. Nor does the record in this case set them forth in any detail. The Letter of Intent and Financial Aid Agreement are also silent with regard to wheth-

**10.** Neither party objected to this definition. It is the definition suggested by *Texas Pattern Jury Charges. See* 2 Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges* PJC 19.01 (2d ed.1989) (hereinafter *Pattern Jury Charges* ). The first clause tracks the language of the Workers' Compensation Act in effect at the time the agreements were signed. *See* Tex.Rev.Civ. Stat. Ann. art. 8309, § 1, repealed by Act of December 11, 1989, 71st Leg., 2d C.S., ch. 1, § 16.01(15), 1989 Tex. Gen. Laws 115. The definition of "employee" for workers' compensation purposes is currently found in section 401.012 of the Texas Labor Code. *See* Tex. Lab.Code Ann. § 401.012 (West Supp.2000). The current definition does not differ in pertinent part from that found in the earlier statute. The remainder of the definition, the right to direct the details of the claimant's work, does not appear in any version of the statute but is derived from case law primarily contrasting an employee with an independent contractor.

*See Pattern Jury Charges, supra,* cmt. at 19–3 (citing *Turnbough v. United Pac. Ins. Co.,* 666 S.W.2d 489, 492 (Tex.1984); *Continental Ins. Co. v. Wolford,* 526 S.W.2d 539 (Tex.1975); *Anchor Cas. Co. v. Hartsfield,* 390 S.W.2d 469 (Tex.1969); *Hartford Accident & Indem. Co. v. Hooten,* 531 S.W.2d 365 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.); *Allstate Ins. Co. v. Scott,* 511 S.W.2d 412 (Tex.Civ.App.— El Paso 1974, writ ref'd n.r.e.); *Goodnight v. Zurich Ins. Co.,* 416 S.W.2d 626 (Tex.Civ. App.—Dallas 1967, writ ref'd n.r.e.)). Although we liberally construe the Workers' Compensation Act in favor of the employee "to carry out [the Act's] evident purpose," *Yeldell v. Holiday Hills Retirement & Nursing Ctr., Inc.,* 701 S.W.2d 243, 245 (Tex.1985), the district court properly submitted the case to a jury. Thus, we apply the "no evidence" standard of review set forth in *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). *See supra* p. 697.

er any rules or regulations of the NCAA would apply to Waldrep or affect his relationship with TCU. Yet it is undisputed that before Waldrep signed the Letter of Intent and Financial Aid Agreement, both he and TCU understood that his recruitment and future football career at TCU would be governed by and subject to the rules of the NCAA.

TEIA, on the other hand, posits that Waldrep clearly and simply did not have a contract of hire. TEIA directs us to *Travelers Insurance Co. v. Brown*, 395 S.W.2d 701 (Tex.Civ.App.—Texarkana 1965, writ ref'd n.r.e.), and *Carnes v. Transport Insurance Co.*, 615 S.W.2d 909 (Tex.Civ. App.—El Paso 1981, writ ref'd n.r.e.), to support its proposition. However, both involve the intervention of a third party and are therefore distinguishable from the case before us. In *Brown*, Louis contracted with Smith to clean the interior walls of a building. Louis then hired Brown to actually do the work. The court of civil appeals held that Brown was not Smith's employee because there was no evidence "of an intention on Smith's part to empower Louis to employ workmen for Smith." *Brown*, 395 S.W.2d at 702. In *Carnes*, Carnes was held not to be an employee of Thrasher while driving a truck leased by Courtney to Thrasher when there was no evidence that Thrasher would pay Carnes, either directly or through Courtney, for Carnes's operation of the vehicle. *See Carnes*, 615 S.W.2d at 912. Neither case, when applied to the facts of Waldrep's relationship with TCU, leads inexorably to the conclusion that there was no contract of hire.

■ Mindful of the district court's definition of employee, the jury was left to determine if there was a "contract of hire" between Waldrep and TCU. We observe that "the most basic policy of contract law

... is the protection of the justified expectations of the parties." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990). Was it the expectation of Waldrep and TCU that Waldrep would become TCU's employee? To form a contract, the parties must mutually assent to its terms. Whether there is such assent is determined "based on objective standards of what the parties said and did and not on their alleged subjective states of mind." *American Nat'l Ins. Co. v. Paul*, 927 S.W.2d 239, 244 (Tex.App.—Austin 1996, writ denied) (quoting *Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 717 (Tex.App.— Houston [1st Dist.] 1988, writ denied)). Because the Letter of Intent and Financial Aid Agreement do not evidence the entire agreement between Waldrep and TCU, we consider them against "the background of circumstances surrounding [their] execution." *Brown*, 395 S.W.2d at 702 (citing *Allison v. Campbell*, 117 Tex. 277, 298 S.W. 523 (Tex. Comm.App.1927, opinion adopted)). We may also look to the parties' conduct after execution of the documents, and such conduct "may be a strong factor in determining just what the real agreement contemplate[d]." *Maryland Cas. Co. v. Brown*, 131 Tex. 404, 115 S.W.2d 394, 396 (1938).

■ On the facts of this record, any contract of hire must have been a contract whereby TCU hired Waldrep to attend the university, remain in good standing academically, and play football. However, if Waldrep played football for pay, he would have been a professional, not an amateur.[11] The evidence reflects that the actions of both Waldrep and TCU were consistent with a joint intention that Waldrep be considered an amateur and not a professional. It is undisputed that before Waldrep signed the Letter of Intent and Fi-

11. The NCAA rules stated that "[a] student-athlete shall not be eligible for intercollegiate athletics if ... [h]e takes or has taken pay, or has accepted the promise of pay, in any form, for participation in athletics, or ... has entered into an agreement of any kind to com-

pete in professional athletics, or to negotiate a professional contract." The National Collegiate Athletic Association, *1972–73 Manual of the National Collegiate Athletic Association* 6 (1972) (the "*NCAA Manual*").

nancial Aid Agreement, both he and TCU understood that his recruitment and future football career at TCU would be governed by and subject to the rules of the NCAA. The record indicates that the NCAA's policies and rules in effect at that time exhibited a concerted effort to ensure that each school governed by these rules made certain that student-athletes were not employees. Indeed, the rules declared that the fundamental policy of the NCAA was "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and, by so doing, retain a clear line of demarcation between college athletics and professional sports." *NCAA Manual* at 5. Following its policy, the evidence reflects that the NCAA rules made the principle of amateurism foremost and established several requirements to ensure that the student-athlete would not be considered a professional. *See id.* at 6. For example, the NCAA had strict rules against student-athletes taking pay for participation in sports, and student-athletes were ineligible to participate if they were receiving or had received a salary from a professional sports organization. *See id.* at 5–6.

Additionally, the record reflects that Waldrep and TCU did not treat the financial aid Waldrep received as "pay" or "income." First, as previously noted, the NCAA rules provided that student-athletes would be ineligible if they used their skill for pay in any form; however, that same rule goes on to state that "a student-athlete may accept scholarships or educational grants-in-aid from his institution" as these benefits do not conflict with the NCAA rules. *Id.* As the NCAA rules were based upon a principle of amateurism and strictly prohibited payment for play, these two provisions together indicate that the NCAA and its participating institutions did not consider the acceptance of financial aid from the institution to be "taking pay." Moreover, the rules provided that any financial aid that exceeded tuition and fees, room and board, required course-related supplies and books, and incidental expenses of fifteen dollars per month would be considered "pay" for participation in intercollegiate athletics. *See id.* at 8. TCU gave Waldrep financial aid for these items but nothing more, indicating that TCU did not intend to pay Waldrep for his participation. Of equal significance, TCU never placed Waldrep on its payroll, never paid him a salary, and never told him that he would be paid a salary. There is no evidence that Waldrep expected a salary. No social security or income tax was withheld from Waldrep's grant-in-aid. *See Continental Ins. Co. v. Wolford,* 526 S.W.2d 539, 540 (Tex.1975) (withholding taxes is *indicia* of employee status). Waldrep never filed a tax return reporting his financial aid. *See Anchor Cas. Co. v. Hartsfield,* 390 S.W.2d 469, 470 (Tex.1965); *Mayo v. Southern Farm Bureau Cas. Ins. Co.,* 688 S.W.2d 241, 243 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.).[12, 13]

12. Waldrep requested the district court to take judicial notice "that at all times relevant to this case ... athletics scholarships were excluded from taxable income and were not required to be reported to the Internal Revenue Service" and directed the court to section 117 of the Internal Revenue Code. The court responded, "I will take notice of it. I think it's something that at least I ought to consider. And if you-all want to have some kind of stipulation read or instruction to the jury, that's fine with me." The record discloses no stipulation or instruction. The Internal Revenue Code provision in effect at the time Waldrep attended TCU provided, *inter alia:* "In the case of an individual, gross income does not include ... any amount received ... as a scholarship at an educational institution ... or ... as a fellowship grant, including the value of contributed services and accommodations...." Internal Revenue Code of 1954, ch. 736, 68A Stat. 38 (codified as amended at I.R.C. § 117(a) (West Supp.1999)). This provision does not eliminate how Waldrep and TCU treated Waldrep's grant-in-aid for tax purposes as an *indicia* of employment. Whether a scholarship or fellowship is includable in the recipient's taxable income is based on the particular circumstances of the grant. *See, e.g., Hembree v. U.S.,* 464 F.2d 1262, 1264 (4th Cir.1972) ("primary purpose of the payment made to the taxpayer" is controlling);

The evidence further reflects that Waldrep and TCU intended that Waldrep participate at TCU as a *student*, not as an *employee*. During the recruitment process, TCU never told Waldrep that he would be an employee, and Waldrep never told TCU that he considered himself to be employed. Moreover, a basic purpose of the NCAA, which governed Waldrep's intercollegiate football career, was to make the student-athlete an integral part of the student body. *See NCAA Manual* at 5. According to the NCAA rules, "[a]n amateur student-athlete is one who engages in athletics for the education, physical, mental and social benefits he derives therefrom, and to whom athletics is an avocation." *Id.* at 6. Of importance is the evidence that Waldrep was aware when he signed the Letter of Intent and Financial Aid Agreement that he would still receive financial aid even if hurt or unable to play football, as long as he complied with the rules of the Southwest Conference. Thus, TCU could not "fire" Waldrep as it could an employee. *See Mayo*, 688 S.W.2d at 243. In addition, when Waldrep signed the agreements, he still had to meet the scholastic requirements for athletic awards and qualify for admission to TCU in order to enroll and participate in the football program. Waldrep testified that he knew when he signed the agreements that in order to play football at TCU he would have to maintain certain academic requirements as a student. Thus, his academic responsibilities dictated whether he could continue to play football.

Financial-aid awards are given to many college and university students based on their abilities in various areas, including music, academics, art, and athletics. Sometimes these students are required to participate in certain programs or activities in return for this aid. But, as the Supreme Court of Indiana observed, "[s]cholarship recipients are considered to be students seeking advanced educational opportunities and are not considered to be professional athletes, musicians or artists employed by the [u]niversity for their skill in their respective areas." *Rensing v. Indiana State Univ. Bd. of Trustees*, 444 N.E.2d 1170, 1174 (Ind.1983).

Although the record in this case contains facts from which the jury could have found that Waldrep and TCU were parties to a contract of hire, there is also probative evidence to the contrary. Viewing the evidence in the light most favorable to the jury's verdict, we hold that the record before us reflects more than a mere scintilla of evidence that Waldrep was not in the service of TCU under a contract of hire.

### Right to Direct the Means or Details of Waldrep's Work

 If, however, we assume the jury found that a contract existed between Waldrep and TCU, we must determine whether there is some evidence concerning TCU's right to direct the means or details of Waldrep's "work." The definition of "employee" submitted to the jury correctly states the recognized test to determine whether an employer-employee relationship exists: the *right* of the employer to direct or control the means or details of the employee's work. *See Mayo*, 688 S.W.2d at 243 (ultimate test in deciding employment question is right of alleged

---

*Burstein v. U.S.*, 224 Ct.Cl. 1, 622 F.2d 529, 537 (1980) ("A purpose of section 117 is to avoid the exclusion of money received as compensation for services but labeled as a 'scholarship' or 'fellowship.' "); *Quast v. U.S.*, 293 F.Supp. 56, 59 (D.Minn.1968) ("The character of the payments ... is determined fundamentally by the usual test of the parties' intent. The question is did the parties intend a scholarship or a fellowship, or in the alternative a salary.").

**13.** *Mayo* sets forth several factors relevant in establishing employment: (1) the right to hire and discharge the worker, (2) the carrying of the worker on social security and income tax withholding records, (3) the providing of equipment, (4) the responsibility to pay wages, and (5) the right to control the specifics of a worker's performance. *See Mayo v. Southern Farm Bureau Cas. Ins. Co.*, 688 S.W.2d 241, 243 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.).

employer to control specifics of worker's performance) (citing *Hartsfield*, 390 S.W.2d at 471). To determine whether there is a right of control, "we first must look to the terms of the employment contract." *Allstate Ins. Co. v. Scott*, 511 S.W.2d 412, 414 (Tex.Civ.App.—El Paso 1974, writ ref'd n.r.e.). Where there is no express contract or where the terms of the contract are indefinite, the *exercise* of control "may be the best evidence available to show the actual terms of the contract." *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 590 (Tex.1964); *see Scott*, 511 S.W.2d at 414. However, " 'the *right* to control' remains the supreme test and the 'exercise of control' necessarily presupposes a right to control which must be related to some agreement expressed or implied." *Love*, 380 S.W.2d at 590 (emphasis added); *see Scott*, 511 S.W.2d at 414 ("the exercise of control, while evidentiary only and not the true test, is the best evidence available in determining the right of control").

██ The record reflects that TCU *exercised* direction and control over all of the athletes in its football program, including non-scholarship players, while they were participating in the *football program*. Waldrep admitted that his high school coaches exercised the same type of control over his participation in sports as the coaches at TCU. Waldrep further testified that he did everything that the coaches told him to do because he wanted to, because he loved the game, and because he wanted to be the best, not because he had to. The evidence is clear that TCU did not have the right to direct or control all of Waldrep's activities during his tenure at the school. The NCAA rules protected Waldrep's financial-aid award even if his physical condition prevented him from playing football for any reason. *See NCAA Manual* at 8. Moreover, TCU could not simply cancel Waldrep's grant-in-aid based on his "athletic ability or his contribution to [the] team's success," or even, in certain circumstances, if he quit. *Id.*

The fact that the athletic department at TCU established practice and meeting times to be observed by those playing football does not establish that TCU had the *right* to direct and control all aspects of the players' activities while enrolled in the university. *See Hartford Accident & Indem. Co. v. Hooten*, 531 S.W.2d 365, 368 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.) (fact that hospital established regulations and rules to be observed by private-duty nurses is no evidence of existence of employer-employee relationship). Waldrep's acceptance of financial aid from TCU did not subject him to any extraordinary degree of control over his academic activities.

Waldrep clearly presented evidence that TCU *exercised* direction or control over some of his activities while a student at the university. Perhaps the jury might have found this sufficient to prove that TCU had the *right* to direct the means or details of Waldrep's activities, but the jury declined to do so. Viewing the evidence in the light most favorable to the jury's verdict, we hold that the record before us reflects more than a mere scintilla of evidence disputing TCU's right of control.

On appeal, Waldrep bears a heavy burden in seeking reversal and rendition based on an adverse finding to a jury issue on which he had the burden of proof. The record before us reflects evidence both for and against the jury's finding. The district court properly left the jury to determine the issue of employment. The circumstances presented in the record before us do not establish an employer-employee relationship as a matter of law. We hold that there is some evidence to support the jury's verdict declining to find that Waldrep was an employee of TCU at the time of his injury. Waldrep has failed to satisfy *Sterner's* first prong. *See Sterner*, 767 S.W.2d at 690.[14] Therefore, we overrule Waldrep's first issue.

---

**14.** Having so held, we need not employ the

second prong required when reviewing an

## Evidentiary Issues

▉ Waldrep argues in his last four issues that the district court erred in admitting and excluding certain evidence on relevancy grounds. Admitting and excluding evidence are matters within the discretion of the trial court; thus, a trial court's ultimate decision in this regard is reviewed under an abuse-of-discretion standard. *See City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995); *Murphy v. Seabarge, Ltd.,* 868 S.W.2d 929, 932 (Tex. App.—Houston [14th Dist.] 1994, writ denied). A court abuses its discretion only when it acts in an unreasonable and arbitrary manner, or when it acts without reference to any guiding principles. *See Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). This Court may not reverse a trial court's ruling for an abuse of discretion merely because we may disagree with that decision. *See Buller,* 806 S.W.2d at 226; *Downer,* 701 S.W.2d at 242.

▉ Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R. Evid. 401. All relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See id.* 402, 403. If a party objects to evidence on these grounds, the trial court must conduct a balancing test, weighing the danger of prejudice against the probative value of the evidence. *See McLellan v. Benson,* 877 S.W.2d 454, 457 (Tex.App.—Houston [1st Dist.] 1994, no writ). "Evidence which is not relevant is inadmissible." Tex.R. Evid. 402.

adverse jury finding as a matter of law. *See supra* p. 697; *Sterner,* 767 S.W.2d at 690. Were we to consider whether the contrary proposition—that Waldrep *was* an employee—was established as a matter of law, our result would be the same. Some, but not all,

## Walter Byers's Deposition

▉ Waldrep first asserts that the district court erred in excluding the deposition of Walter Byers. Byers was the executive director of the NCAA from 1952 to 1988. In 1995, more than six years after he left the NCAA and more than twenty years after Waldrep's injury, Byers wrote a book entitled *Unsportsmanlike Conduct,* in which he expresses his opinions on what he asserts to be the exploitation of college athletes. The district court excluded Byers's deposition, concluding that the testimony was irrelevant and to the extent that it was relevant, its relevance was far outweighed by its prejudicial effect.

Byers prefaced his deposition with the following statement:

Well, I was just going to make this comment that I came here to answer any questions concerning a book I've written, *Unsportsmanlike Conduct* is the name, exploiting college athletes published by the University of Michigan Press. And I know I have no informed information of any particular insights into the incident in question which occurred in a football game involving TCU and Alabama, nor do I have any particular knowledge of the Texas rules and regulations that apply to the various agencies that may be involved here. So I wanted to make the simple point that I'm pleased to answer any questions related to what I have written in my book, and that's really why I agreed to participate in these proceedings.

Byers also admitted that when he headed the NCAA he never voiced the opinions that he espouses throughout his book.

At many points throughout his deposition, Byers expressed his opinions of the

of the *Mayo* factors were present in Waldrep's relationship with TCU. *See supra* note 12; *Mayo,* 688 S.W.2d at 243. As *some* evidence would support either proposition, Waldrep would fail in his burden.

NCAA, its rules, and how these rules could be better; however, he failed to point to anything supporting his opinions or discuss how his views relate to Waldrep's status as an employee while at TCU. For example, Byers noted that the central argument in his book is that "the athlete [is] already ... under contract on a pay scheme that is set in place by the national body and it's time to change that," recommending that "the one-year pay scheme, a contract for pay, is outdated and there should be *drastic changes* in the rules." (Emphasis added.) Byers later opined:

> [C]ollege athletics has become a national major league entertainment business and millions upon millions of new dollars have flown into the system.... Television not only changed the face of college athletics, ... it changed the very heart and soul because the management of college athletics looked at these negotiations and the contracts they were signing for big dollars as this is strictly a business enterprise. And I think that attitude has affected substantially the way the colleges deal with their students....

And Byers concluded his testimony by summarizing his book's main argument:

> [T]he athlete is unfairly restricted by the financial aid rules ... which are imposed upon him by the people who benefit most from this billion-dollar entertainment industry. And the rules governing the athlete should be liberalized and changed.

Byers's opinions and references to his book for support throughout his deposition clearly are not probative of whether Waldrep was an employee of TCU at the time of his injury. In addition, the danger that his rhetoric would result in unfair prejudice was particularly great given Byers's background and apparent knowledge.

Byers reviewed the history of the NCAA and the evolution of its rules. Specifically, Byers asserted that a grant-in-aid system was created in 1956 to provide athletes their educational expenses and "to get rid of under-the-table payments" to athletes. Waldrep several times asked Byers to describe how the phrase "student-athlete" came into being. Waldrep argues that the origin of the term is relevant because it is used in the Letter of Intent and was coined "to avoid liability under worker's compensation laws." Byers, however, never directly answered the question. He related that when the grant-in-aid program became permissible under NCAA rules, "cases arose and the arguments were being made that the [g]rant-in-aid was solely a stipend given to a player to play athletics." The NCAA's member institutions were concerned that a grant-in-aid would be considered a contract for play. The NCAA amended its rules "to put student first ahead of athlete and to emphasize that although they are getting a[g]rant-in-aid, they have to be a student first and an athlete second." Byers went on to say that the NCAA created "a number of safeguards around awarding a[g]rant-in-aid to make it clear the intent was education first and sports competition second." Appended to Byers's deposition were two memoranda. The first, dated July 1964, was authored by Marcus L. Plant, who was described by Byers as a professor of law at the University of Michigan, and describes then-current case-law application of workers' compensation laws to students who also participated in athletics at colleges and universities. This memorandum was apparently distributed at a meeting of the NCAA counsel (the policy-making group of the NCAA) in the summer of 1964. When asked if the memoranda indicated that the term "student-athlete" was invented to stop workers' compensation claims, Byers stated only that use of the term would allow colleges to better "deal with" such claims. He did note that there was a tendency "for state agencies or other governmental departments to consider a[g]rant-in-aid holder playing athletics to be an employee." He went on to say that the student-athlete term was "put in place to make clear the

colleges' intent that the [g]rant-in-aid was not a for-pay contract, but it was a legitimate ... scholarship or underwriting a youngster's education."[15]

Although portions of the evidence provided in Byers's deposition may have some probative value, the district court could have reasonably determined that its probative value was substantially outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403. Byers's testimony could have afforded the jury some information about the NCAA rules and how the term "student-athlete" came about. However, it is evident that the opinions he espoused throughout his testimony regarding what he perceived as the NCAA's current thirst for more money and the reason why in today's world the NCAA should drastically change its rules, are not relevant to whether Waldrep was an employee of TCU at the time of his injury in 1974. We hold, therefore, that the district court did not abuse his discretion in determining that Byers's testimony was for the most part irrelevant and to the extent that it was relevant, the danger of unfair prejudice substantially outweighed the probative value of the evidence.

■■■■ Even if the district court's decision constituted error, "[t]he exclusion of evidence ordinarily does not constitute reversible error unless the complaining party can demonstrate that the whole case turns on the excluded evidence." *Porter v. Nemir*, 900 S.W.2d 376, 381 (Tex.App.— Austin 1995, no writ). Byers testified to the same or similar evidence as a witness for TEIA, Frank Windegger, concerning the background of the NCAA and the money that the NCAA makes as a result of college athletics. At the time of trial, Windegger was TCU's athletic director. Moreover, Byers's testimony in some respects supported TEIA's argument that TCU and Waldrep did not intend for Waldrep to be considered an employee. He confirmed that in *Unsportsmanlike Conduct* he expressed "shock" that students

receiving grants-in-aid might be classified as "workers." Both TCU and Waldrep understood that the NCAA rules applied to Waldrep while he participated at TCU and that those rules were created to make clear that Waldrep was not being paid to play football. Byers repeatedly stated that the NCAA and its members wished to make it clear that the grant-in-aid recipient was a student first and a participant in athletics second. His testimony could be argued to establish that TCU did not intend to employ Waldrep by having him sign the Letter of Intent and Financial Aid Agreement. We cannot say that Waldrep's entire case turned on Byers's excluded testimony.

Waldrep also contends that the district court erred when it excluded Byers's deposition pursuant to rule 403 because there is no evidence showing that the district court actually read the deposition. *See* Tex.R. Evid. 403. Waldrep directs us to *Bean v. Baxter Healthcare Corp.*, 965 S.W.2d 656 (Tex.App.—Houston [14th Dist.] 1998, no pet.), to support his argument. However, *Bean* is factually distinguishable. In *Bean*, the court of appeals affirmatively found that the trial court failed to view a videotape. *See id.* at 659. Here, there is no evidence that the district court did not read Byers's deposition or view its videotape. We find that this claim is without merit.

■■■■ Waldrep finally asserts that "even if the court did not err in excluding Byers'[s] testimony and exhibits from Waldrep's case-in-chief, the court erred in excluding the evidence during rebuttal." Stephen Morgan, who was employed by the NCAA in several positions from 1977 to the time of his testimony, testified by way of deposition for TEIA. Waldrep directs us to certain points in Morgan's testimony where "[h]e was allowed to testify at length ... about the background, history, and construction of the NCAA 'rules,'" and contends that Byers's testimony con-

**15.** *See Rensing v. Indiana State Univ. Bd. of* *Trustees,* 444 N.E.2d 1170, 1174 (Ind.1983).

tained "completely different information" and should have been admitted to rebut Morgan's testimony. "[T]estimony which is inadmissible in the first instance *may* become relevant and admissible in rebuttal." *Johnson v. Hermann Hosp.*, 659 S.W.2d 124, 126 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.) (emphasis added). But the alleged rebuttal evidence must be in fact offered to *rebut* other evidence, not as a part of the proponent's case-in-chief. *See Minor v. Commercial Ins. Co.*, 557 S.W.2d 608, 610 (Tex.Civ. App.—Texarkana 1977, no writ).

■ In his deposition, Morgan first gave a detailed description of the NCAA very similar to the description given in Byers's deposition. And while Morgan did testify to the evolution of the NCAA rules, his testimony was limited to the evolution from 1972 through 1974, the years that Waldrep played football at TCU. Morgan discussed what the "concept" of the term "student-athlete" referred to at that time, but he did not discuss the reasons why the term "student-athlete" was created. And finally, Morgan described those portions of the 1972–73 NCAA rules related to its fundamental policy, academic requirements, financial aid awards, and restrictions on taking pay.

For the most part, Morgan's and Byers's testimony related to different topics. Morgan's testimony was limited to only those rules and terms that applied while Waldrep attended TCU. Byers, on the other hand, testified about the rules from their enactment through the time he wrote his book. Morgan's testimony was limited to the 1972–73 NCAA rules and what they referred to. Byers, however, never discussed these specific rules; instead, he analyzed the rules on a much broader scale. To the extent that Morgan and Byers testified about the same topic, their testimony was strikingly similar. We conclude that Byers's deposition was not offered by way of rebuttal but as part of Waldrep's case-in-chief. We hold that the district court did not abuse his discretion

by excluding this evidence. We overrule Waldrep's second issue.

### NCAA Constitution and Bylaws

■ Waldrep next contends that the district court improperly admitted testimony regarding the NCAA rules on the grounds of relevancy, arguing that these rules cannot preclude an injured worker from receiving workers' compensation benefits. The sole issue submitted to the jury addressed whether Waldrep was an employee of TCU at the time of his injury. The NCAA rules applied to TCU and Waldrep while Waldrep was recruited, signed the Letter of Intent and Financial Aid Agreement, and participated in TCU's football program. Waldrep testified that he knew when he signed the Letter of Intent and Financial Aid Agreement that recruitment and his future involvement in athletics at TCU was governed by the NCAA rules, and he admitted that he understood the NCAA's fundamental rules.

The NCAA rules tend to indicate the terms of Waldrep's agreement with TCU, including whether Waldrep was an employee at TCU. We conclude therefore that the NCAA rules were relevant to the jury's determination, and the district court did not abuse his discretion in admitting the evidence. We overrule Waldrep's third issue.

### Medical Expenses

■ By his fourth issue, Waldrep challenges, on relevancy grounds, the district court's excluding evidence that TCU failed to pay Waldrep's medical expenses. The district court admitted evidence that TCU promised Waldrep's parents that it would "take care" of his medical expenses if he were injured but excluded evidence that TCU did not pay all of those expenses. The district court refused to allow the proffered testimony on the grounds of relevancy:

> What is relevant in this case is evidence that shows that Mr. Waldrep was an employee of TCU. The fact that TCU did pay some expenses is relevant to

prove employment. The fact that TCU might not have paid some of the expenses tends to show either, one, that he was not an employee—and that's something that the defense wants to show— or that TCU may have breached a contract by not paying those expenses, and that's not an issue in this case.

So I sustain the objection that—as to any evidence that TCU did not pay all of the expenses. And I will allow evidence or stipulation that TCU did pay expenses, but not evidence that TCU paid only some of the expenses.

■ Again, the sole issue in this case is whether Waldrep was an employee of TCU. The admission and exclusion of evidence is within the discretion of the trial court. *See Alvarado*, 897 S.W.2d at 753; *Murphy*, 868 S.W.2d at 932. The district court admitted the testimony of Waldrep, Waldrep's parents, Runnells, and Windegger that TCU promised to "take care" of Waldrep's medical expenses. Such testimony is evidence that might tend to show the existence of a contract of hire between Waldrep and TCU. The *existence* of such a contract was the issue before the jury, not whether any contract between the parties was breached. We cannot say that the district court acted in an unreasonable and arbitrary manner or without reference to any guiding principles in making his ruling. *See Buller*, 806 S.W.2d at 226; *Downer*, 701 S.W.2d at 241–42.

Waldrep also argues that the district court improperly permitted TEIA to offer evidence that TCU fulfilled its promise to take care of Waldrep's medical expenses and that this was a "partial truth" that Waldrep was not allowed to rebut. However, Waldrep does not offer any argument or authority to support his assertion. Waldrep's brief states only that TEIA "presented testimony that TCU paid for Waldrep's expenses." We are unable to locate such testimony in the record, and Waldrep does not direct us to it. *See* Tex.R.App. P. 38.1(h) (brief must contain appropriate citations to record). We overrule Waldrep's fourth issue.

### Cumulative Effect of District Court's Evidentiary Decisions

Waldrep finally argues that the district court's "multiple errors regarding the admission and exclusion of evidence constitute reversible error, even if the errors, taken separately, were harmless." As we have held that the district court did not abuse his discretion in admitting or excluding evidence, we find this issue to be without merit. We overrule Waldrep's fifth issue.

### CONCLUSION

In conclusion, we note that we are aware college athletics has changed dramatically over the years since Waldrep's injury. Our decision today is based on facts and circumstances as they existed almost twenty-six years ago. We express no opinion as to whether our decision would be the same in an analogous situation arising today; therefore, our opinion should not be read too broadly. Having disposed of all of the issues before us, we affirm the district court's judgment.