Dissenting opinion issued May 31, 2002






 







In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-99-01345-CV

____________


COASTAL TANKSHIPS, U.S.A., INC., Appellant


V.


FLORENCE ANDERSON, ADMINISTRATRIX OF THE ESTATE OF
MORRIS ANDERSON, DECEASED, Appellee






On Appeal from the 212th District Court

Galveston County, Texas

Trial Court Cause No. 95CV0220





DISSENTING OPINION


 I join parts I through IV(D) of Justice Jennings's opinion for the en banc Court. 
However, I disagree with part IV(E) of that opinion and thus with the conclusion and
judgment. Accordingly, I respectfully dissent.

Sufficiency of Evidence Other Than Dr. Miller's Causation Opinion



 I agree with the majority that Anderson had to prove causation by expert
testimony. Unlike the majority, however, I would hold that Dr. Brown's written
diagnosis and testimony by Coastal's Dr. Wilson, along with the naphtha material
safety data sheet ("MSDS"), supplied the general causation link that Dr. Miller's
opinion lacked.

 1. Additional Comments on the Standard of Review

 Under the Jones Act, we inquire whether the evidence reasonably justifies the
conclusion that Coastal's negligence played any part, "even the slightest," in
producing the injury at issue. E.g., Maritime Overseas Corp. v. Ellis, 971 S.W.2d
402, 406 (Tex. 1998). It would be hard to imagine a standard of review more
favorable to a plaintiff. Certainly, this standard of review is more favorable than that
under the traditional evidentiary standards: under the Jones Act, the jury enjoys
complete discretion in deciding factual liability issues, and we uphold the verdict if
it is supported by some, "even the slightest" evidence. (1) Id. at 406; Offshore Pipelines
v. Schooley, 984 S.W.2d 654, 663 (Tex. App.--Houston [1st Dist.] 1998, no pet.). 

 2. Dr. Brown's Opinion

 Coastal did not sufficiently object under Robinson and Havner to Dr. Brown's
medical records; (2) thus, Coastal may not now challenge the use of Dr. Brown's
causation opinions within those records to support general or specific causation. See
Maritime Overseas Corp, 971 S.W.2d at 409 ("To preserve a complaint that scientific
evidence is unreliable and thus, no evidence, a party must object to the evidence
before trial or when the evidence is offered."). 

 I set out Dr. Brown's initial file note of September 27, 1994 in full:

 [Anderson] presented a long history, very carefully given,
that he was in a foreign port when they took on a load of
naphtha. The fumes were extremely heavy and gagged
him, and caused him kind of a respiratory type breathing
problem that resulted in some chest pain. He had a hacking
cough, which is documented in the communications. He
had a diagnosis of tracheobronchitis, which is documented
in the communications sent to me.


 Here in my office I got a history that he was a long time
employee of Reynolds Metals, never any serious illnesses. 
He had a hernia operation in 1971. There is no history of
any on the job illnesses that I know of. Socially, he doesn't
drink coffee or tea, and he does not smoke or use tobacco
products. Only upon occasion does he drink any alcohol
whatsoever. As I listened carefully, the man related that he
had been confined to his room and "quarantined" for six
days. It got more difficult for him to breathe, and he had
progressively more chest pain. He also went on to relate
that they took on a load and that the fumes were very
difficult to tolerate and caused a lot of bronchospasm,
coughing and chest discomfort.


 He got to my practice in sort of a circuitous route, in that
Dr. Vela here in Corpus Christi was unable to see him, and
they wanted somebody who had dealt with [text whited
out] in the past. Having dealt with high chain aeromatic
hydrocarbons since the early 70's, when I was the medical
director at Coastal States Gas Producing here in Corpus
Christi, I became familiar with the types of pneumonia that
this particular product could cause.


 Head, eyes, ears, nose and throat revealed a bright red
pharynx and bright red ears. This man was using the
accessory strap muscles of respiration and appeared quite
ill. Otherwise the head, eyes, ears, nose and throat were
normal. Ausculation of the lungs revealed that he was
barely moving any air at all, and it sounded as if he might
have some sort of emphysema or chronic obstructive
pulmonary disease. I went on to ask about asbestos, and
the only history I got of asbestos was that he had worked at
Reynolds Martin for 30 years and had had chest films every
year, and that nothing had ever come up abnormal.


 Today we did an EKG, which revealed a sinus rhythm with
a right ventricular conduction delay. He had a pulmonary
function testing, which revealed extremely restricted FEV-1 of only about 50% of predicted [illegible] and extremely
restricted air flow. A chest x-ray revealed a fleecy
peribronchiolar infiltrate around the hilum of the lungs and
almost a consolidated pneumonia in the lung bases
bilaterally, but more pronounced on the right than the left. 
I went back and re-examined the patient and found out that
he was actually a little bit more hypoxic than I felt. At this
point I felt like I needed to back up [sic] the expertise of
the hospital and the pulmonologist.


 My impression was that he had an aspiration/chemical
type pneumonia secondary to the breathing of a high chain
aeromatic hydrocarbon such as naphtha. The history
o[whited out] contamination I figured probably would have
resulted in a dead patient. Long standing exposure to
asbestos, if he had it, and I am not sure he did, would result
in markedly different looking chest film, which would be
read as asbestosis. At any rate, I felt that the man's
wellness was in jeopardy and that I needed the support of
the hospital and consultation of Dr. David Miller, local
pulmonologist. 


 I think the prognosis is guarded at this point.


(Emphasis added.) The discharge summary that Dr. Brown co-signed also states in
part as follows:

 Patient was admitted to the hospital due to shortness of
breath and due to his history of exposure to naphtha from
working as a merchant marine. Patient was also exposed
to asbestos from working at Reynolds Aluminum Foil Plant
locally for 30 years. He was exposed to Naphtha while
working as a merchant marine for the past 4 years. Upon
admission, a chest x-ray was done which showed diffuse
infiltrates in both lungs, most severe in the lower right lobe
consistent with pneumonitis (3) secondary to chemical
exposure. CT scan done with contrast to evaluate
interstitial lung disease showed fibrosis in both lung bases
with a predominantly peripheral distribution. Possibilities
include usual interstitial pneumonitis secondary to
rheumatologic disease, asbestosis is less likely due to the
absent [sic] of pleural plaques a condition that can result in
this case. Other conditions that can result in basilar
fibrosis are scleroderma and chronic aspiration. Repeat
chest exam done on the 1st of October 1994, showed a
worsening of the right base, preexisting infiltrates and they
are still present. Repeat chest exam on the 3rd of October
showed unimproved bibasilar pneumonia and no new
complications. Repeat on the 5th showed no new
complications. Lung biopsy which was performed on the
30th of September 1994, path report shows diagnosis as
previously stated. Biopsy was done on the right lower and
middle lung biopsy and showed bronchiolitis obliterans,
organizing pneumonia [BOOP].


(Emphasis added.) In various other documents, Dr. Brown reiterates in shorthand his
diagnosis of BOOP secondary to toxic exposure. (4)

 Contrary to Coastal's argument, Dr. Brown's diagnostic records are not like
those in Burroughs Wellcome Co. v. Crye. 907 S.W.2d 497 (Tex. 1995). In Crye,
neither a Robinson/Havner nor a Jones Act case, the Court held that medical records
were no evidence that Polysporin spray caused frostbite. Id. at 500. But there, the
uncontroverted evidence showed the plaintiff had a physical reaction to the spray that
her own expert testified would not indicate frostbite, and the medical records were
mere recitations of medical history or were based on lay or flawed expert opinions,
including an expert opinion based on assumed facts that varied materially from the
actual, undisputed facts. Id. at 499-500. Here, in contrast, Dr. Brown was the first
to diagnose causation; he based that initial diagnosis on what approximates a
differential diagnosis and on his lengthy personal experience (including as medical
director of Coastal States Gas Producing Company) with pneumoniae due to high-chain aromatic hydrocarbons; and he reiterated (albeit summarily) this causation
diagnosis after Anderson underwent multiple medical tests. Expert causation
testimony must rest in reasonable medical probability, but reasonable probability is
determined from the opinion's context and substance, not by semantics or a particular
term's use. Id. at 500. Dr. Brown's diagnosis meets this test. This is so even if
Anderson did not present Dr. Brown as his trial expert because we must consider the
entire record in a sufficiency review. Dr. Brown's written diagnosis is some evidence
of specific causation, because it is a differential diagnosis, and also of general
causation, because Coastal did not properly object to this aspect of Dr. Brown's
diagnosis. See Ellis, 971 S.W.2d at 409.

 3. Other Evidence of General Causation


 Besides Dr. Brown's diagnosis, the pathology report comments that multiple
conditions can, in general, be "associated with" BOOP, including toxic industrial
fumes, drugs, infections, chronic aspiration, collagen vascular disease, bronchial
obstruction, and "idiopathic." It is thus significant that the naphtha MSDS, which
federal regulations required Coastal to post on this vessel, states "pneumonitis" is a
potential effect of overexposure to naphtha; (5) that Coastal's counsel agreed at oral
argument that "pneumonitis" is the same thing as "pneumonia"; (6) and that Dr. Wilson,
Coastal's own expert, testified that chemical pneumonia, which Drs. Brown and
Miller concluded Anderson first had, can cause BOOP. (7) These were Coastal's
documents, Coastal's admission, and Coastal's expert. I consider these to be highly
significant pieces of evidence.

 For example, federal regulations require an MSDS for "hazardous chemicals,"
which are defined in pertinent part as any chemical that is a "health hazard." 29
C.F.R. § 1910.1200(c) (2001). "Health hazard" is defined as "a chemical for which
there is statistically significant evidence based on at least one study conducted in
accordance with established scientific principles that acute or chronic health effects
may occur in exposed employees." Id. The chemical's manufacturer or importer, or
an employer that opts to do its own testing, (8) must "identify and consider the available
scientific evidence concerning such [health] hazards." The regulation further declares
that "evidence which is statistically significant and which is based on at least one
positive study conducted in accordance with established scientific principles is
considered to be sufficient to establish a hazardous effect if the result of the study
meets the definitions of health hazards in this section," noting also that the
regulation's Appendix B must be consulted for criteria to be used in the chemical's
evaluation, the data to be reported, and the chemical's listing as hazardous. Id. at (c),
(d)(2). Appendix B provides, among other things, that the results of any studies that
"are designed and conducted according to established scientific principles, and which
report statistically significant conclusions regarding the health effects of a chemical,
shall be a sufficient basis for a hazard determination and reported on any [MSDS]." 
Id., Appendix B, 4. 

 We do not know who compiled this naphtha MSDS or exactly what testing
procedures that entity used. It could have been The Coastal Corporation, whose
name, address, and phone number appeared at the top of the MSDS, or one of the 17
apparently related corporations also listed there. See 29 C.F.R. § 1910.1200(c),
(d)(1)-(2), (g)(1) (2001) (allowing the chemical's manufacturer or importer, or an
employer that opts to do its own testing, to conduct the chemical's testing and
develop the MSDS; also defining "employer" as "a person engaged in a business
where chemicals are either used, distributed, or are produced for use or distribution,
including a contractor or subcontractor"). Taking the evidence in the light most
favorable to the judgment, we should assume the MSDS was done by some Coastal
corporate body. But even without this assumption, whichever entity compiled this
MSDS had to meet the above regulations in determining the chemical's health
hazards. This fact makes the MSDS a sufficiently reliable link in the general
causation chain, especially given (1) that that link was Coastal's own business
document and (2) our "even the slightest evidence" standard of review.

 4. Conclusion

 The trial judge would not have abused his discretion if he impliedly determined
that (1) specific causation was reliably proved by Dr. Miller's opinion and (2) general
causation was reliably proved by Dr. Brown's written diagnosis and Coastal's own
expert and document. (9) Applying the Jones Act "featherweight" causation standard,
I would accordingly hold there is legally sufficient evidence that Anderson's naphtha
exposure "played any part, even the slightest" in causing his BOOP. See Ellis, 971
S.W.2d at 406. I would thus overrule Coastal's issues one and two and reach its
remaining issues.

 For these reasons, I respectfully dissent from the en banc Court's judgment.


 Murry B. Cohen

 Justice


Panel consists of Justices Cohen, Brister, (10) and Smith. (11)


Justice Brister dissented from the panel's decision to affirm the trial court's judgment.


En banc consideration was requested. Tex. R. App. P. 41.2(c).


A majority of the Court voted for en banc consideration of the panel's decision. See
id.


The en banc Court consists of Chief Justice Schneider and Justices Cohen, Mirabal,
Hedges, Taft, Nuchia, Jennings, Radack, Keyes, Brister, Wilson, (12) and Smith.


Justice Jennings, writing for the majority of the en banc Court, joined by Chief Justice
Schneider and Justices Hedges, Taft, Nuchia, and Radack. See Tex. R. App. P. 47.5.


Justice Brister concurring in the judgment of the en banc Court.

 

Justice Cohen, joined by Justices Mirabal and Smith, joining only sections I through
IV(D) of the en banc Court's majority opinion and dissenting from the judgment of
the en banc Court. See id.


Justices Keyes and Wilson not participating. See id. 


Publish. Tex. R. App. P. 47.
1. Traditional no-evidence review requires something more than a mere
evidentiary scintilla, which means "a barely perceptible manifestation," "the
slightest particle or trace," and "a spark; a remaining particle; a trifle; the
least particle." Waldrep v. Texas Employers' Ins. Ass'n, 21 S.W.3d 692, 697
(Tex. App.--Austin 2000, pet. denied) (quoting W. Wendell Hall, Standards
of Review in Texas, 29 St. Mary's L.J. 351, 480 n.858 (1998)). That is, the
evidence need rise only "to a level that would enable reasonable and
fair-minded people to differ in their conclusions." Merrell Dow Pharms., Inc.
v. Havner, 953 S.W.2d 706, 711 (Tex.1997) (citing Burroughs Wellcome Co.
v. Crye, 907 S.W.2d 497, 499 (Tex. 1995)). Our standard of review here is
even lighter than this.
2. Dr. Brown's medical records were part of plaintiff's exhibit 28. Coastal's only
objection to that exhibit was, "There is an objection to the record to the extent
they [sic] include opinions regarding medical causation for the reasons that we
have previously discussed." Coastal did not then mention Dr. Brown or
explain why his causation opinions, as opposed to Dr. Miller's, were
unreliable. Plaintiff's exhibit 28, which fills an entire reporter's record
volume, is comprised of 288 pages of medical records from one medical center
and three doctors, including Drs. Miller and Brown. A Robinson/Havner
objection must be specific. See, e.g., Scherl v. State, 7 S.W.3d 650, 651-52
(Tex. App.--Texarkana 1999, pet. ref'd) (under equivalent criminal rule);
Chisum v. State, 988 S.W.2d 244, 250-51 (Tex. App.--Texarkana 1998, pet.
ref'd) (same); Hon. Harvey Brown, Procedural Issues Under Daubert, 36
Hous. L. Rev. 1133, 139-41 (Winter 1999). Coastal's "previously discussed"
challenges concerned mainly Dr. Miller's causation opinions, not Dr. Brown's,
making the objection ambiguous. Compare Tex. R. Evid. 103(a)(1) (requiring
statement of specific objection ground, unless context makes ground
apparent--which context does not here); Tex. R. App. P. 33.1(a)(1)(A) (same). 
Additionally, Coastal neither specified to which of these many pages it was
objecting, nor claimed all 288 pages were inadmissible. In fact, no one
disputes that many pages were admissible. Nor did Coastal object to
Anderson's offering the stack of records without first segregating out the
admissible from the inadmissible portions. For these reasons, too, the trial
judge did not abuse his discretion in overruling Coastal's objection to exhibit
28--especially given that Coastal did not carry its initial burden to object
specifically. See, e.g., Brown & Root v. Haddad, 180 S.W.2d 339, 342 (Tex.
1944); Leaird's, Inc. v. Wrangler, Inc., 31 S.W.3d 688, 692 (Tex. App.--Waco
2000, pet. denied); Ideal Mut. Ins. Co. v. Sullivan, 678 S.W.2d 98, 101 (Tex.
App.--El Paso 1984, writ dism'd). Compare Hurtado v. Texas Employers'
Ins. Ass'n, 574 S.W.2d 536, 538-39 (Tex. 1978). 
3. "Pneumonitis" means an "inflammation of the lungs." Stedman's Medical
Dictionary (27th ed. 2000) at 1141; see note 6, below.
4. Dr. Brown's records occasionally indicate BOOP secondary to toxic or
infectious exposure, but this wording seems to have come from the pathology
report, in which the pathologist simply listed the known causes of BOOP. In
any event, we must review the evidence in the light most favorable to
Anderson.
5. The MSDS indicated that naphtha can irritate mucous membranes and the
respiratory tract and can act as an asphyxiant; that overexposure can lead to
headache, nausea, drowsiness, fatigue, pneumonitis, pulmonary edema, and
central nervous system depression; and that naphtha can cause stomach
irritation, unconsciousness, congestion, and hemorrhaging of the lung and
internal organs.
6. See also Stedman's Medical Dictionary (27th ed. 2000) at 1141
("pneumonia" and "pneumonitis" both characterized as "inflammation of the
lungs," with each term cross-referencing the other).
7. Coastal argues that we may not consider Dr. Brown's initial diagnosis of
pneumonitis secondary to chemical exposure because later pathology tests
revealed Anderson had BOOP, not chemical pneumonia. This argument does
not take the evidence in the light most favorable to Anderson. Viewed in the
appropriate light, Dr. Brown's diagnosis could be interpreted to mean either
that he believed Anderson had an initial bout of chemical pneumonia that
turned into BOOP or that Anderson's BOOP, even if initially mistaken for
chemical pneumonia, appeared nonetheless to be caused by chemical
inhalation. That is, the diagnoses of chemical pneumonia and BOOP are not
necessarily inconsistent or mutually exclusive.
8. Any of these three entities may conduct the chemical's testing and develop the
MSDS. 29 C.F.R. § 1910.1200(d)(1)-(2), (g)(1) (2001).
9. Moore v. Ashland Chemical, Inc. and Cavallo v. Star Enterprises, on which
Coastal and the majority rely, are distinguishable because the appellate courts
there held the trial judge's ruling on "close" issues was within his discretion,
the opposite of what Coastal seeks to do here. See Moore v. Ashland
Chemical, Inc., 151 F.3d 269, 278-79 (5th Cir. 1998); id. at 279 (Benavides,
J., concurring); Cavallo v. Star Enters., 892 F. Supp. 756 (E.D. Va. 1995),
aff'd in part on same grounds, rev'd in part on other grounds, 100 F.3d 1150,
1159 (4th Cir.); see also Green v. Texas Workers' Comp. Ins. Facility, 993
S.W.2d 839, 844 (Tex. App.--Austin 1999, pet. denied).
10. The Honorable Scott Brister, who became Chief Justice of the Fourteenth
Court of Appeals on July 16, 2001, continues to participate by assignment for
the disposition of this case, which was submitted on May 7, 2001.
11. The Honorable Jackson B. Smith, retired Justice, Court of Appeals, First
District of Texas at Houston, participating by assignment.
12. The Honorable Davie L. Wilson, who retired from the First Court of Appeals
on March 31, 2002, continues to sit by assignment for the disposition of this
cause, which the Court voted to consider en banc before Justice Wilson's
retirement.