

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00675-CV

**BEXAR APPRAISAL DISTRICT**,
Appellant

v.

**ABASTO PROPERTIES LLC**, et al.,
Appellees

From the 407th Judicial District Court, Bexar County, Texas
Trial Court No. 2018-CI-12685
Honorable Cynthia Marie Chapa, Judge Presiding

Opinion by: H. Todd McCray, Justice

Sitting: Irene Rios, Justice
H. Todd McCray, Justice
Velia J. Meza, Justice

Delivered and Filed: December 10, 2025

AFFIRMED

This is an appeal from a jury verdict in favor of property owners ("Owners"), who challenged the appraised values of their property by the Bexar Appraisal District (the "District"). After the jury returned a verdict in favor of Owners, the District filed this appeal, challenging the jury's property valuations, evidentiary rulings (including the admission of appellees' expert evidence), and the award of attorney's fees. We affirm.

## BACKGROUND

The San Antonio Wholesale Produce Market ("SAWPM") is a unified warehouse and distribution center for produce and other food products. Like similar cold storage wholesale warehouse facilities in Bexar County that SAWPM competes against (for customers and tenants), the SAWPM operates under one centralized management system with the goal of offering a variety of produce and food products to its customers in one convenient location. The SAWPM is located in Southeast Bexar County and is made up of sixty cold storage units. Each unit is 4,000 square feet and is essentially the same, with the same floor plan and amount of cold storage. The sixty units are contained in two 120,000 square feet buildings with thirty units in each building.

The sixty units are separately owned, subject to a condominium regime. In other words, each owner owns their own unit and a 1/60th undivided interest in the commonly owned areas. The general common elements of the SAWPM, consist of the land underneath the buildings, the roofs, foundations, beams, supports, main walls, loading docks, roof sprinkler system, exterior fencing, and parking area.

Abasto Properties LLC, developed the SAWPM in 2014 and sold fifty of the condominiums. Abasto owns the remaining ten condominiums and manages the SAWPM facilities. Before Abasto established the condominium regime and sold off the condominiums, the District listed the 240,000 square-foot facility in Abasto's name. After Abasto created the condominium regime, the District created individual accounts for each unit. However, the District still maintains an account for the entire SAWPM facility.

For tax year 2018, the District appraised each of the SAWPM condominium units at $250,000. This appraisal includes the unit's 1/60th undivided interest in the SAWPM commonly owned property. These appraisals more than doubled in 2019, to $510,350, and increased to

$531,170 in 2020. The Owners raised unequal appraisal claims pursuant to Section 42.26(a)(3) of the Texas Property Tax Code, claiming the District's appraised values of the sixty units (the "Subject Properties") in the SAWPM exceeded the median appraised value of a reasonable number of comparable properties appropriately adjusted for tax years 2018, 2019, and 2020. Under this statutory remedy, an owner must prove that "the appraised value of the property exceeds the median appraised value of a reasonable number of comparable properties appropriately adjusted." TEX. TAX. CODE § 42.26(a)(3).

Two appraisal experts testified at trial: Josh Wood for the District and Andrew Craig for the Owners. The only properties Wood used to determine the median appraised values were the other, individually owned 4,000 square-foot condominiums comprising the SAWPM. In other words, Wood's valuation for each of the Subject Properties in this litigation was based solely upon his valuation of the other fifty-nine Subject Properties in this litigation. Wood testified that the median appraised values for the condominiums, depending on each unit's finish-out, were between $250,000 to $263,607 for 2018; $510,350 to $538,065 for 2019, and $531,170 to $559,950 for 2020.

Conversely, Craig used eleven large, cold-storage facilities as comparables, including facilities that directly compete with SAWPM for tenants and/or produce customers. In his analysis, Craig found a per-square-foot median appraised value of the 11 facilities and then multiplied that number by 240,000 to arrive at a median appraised value for the entire SAWPM facility. Craig then divided that number by sixty to apportion the median appraised value among the Subject Properties. Craig's per-condominium valuations were $179,560 for 2018, $200,080 for 2019, and $209,280 for 2020.

The jury found that the condominiums were not unequally appraised in 2018—affirming the District's original appraised value of $250,000 per unit. But the jury found the Subject Properties were unequally appraised for 2019 and 2020 and determined a valuation of $260,000 per condominium for 2019 and $270,400 per condominium for 2020. The jury's valuations fell within the range created by Craig's valuations and Wood's significantly higher valuations.

| Tax Year | Challenged Tax Appraisal Valuations (per Condominium) | Wood's Valuation | Craig's Valuation | Jury's Valuation |
|----------|----------|----------|----------|----------|
| 2018 | $250,000 | $250,000 to $263,607 | $179,560 | $250,000 |
| 2019 | $510,350 | $510,350 to $538,065 | $200,080 | $260,000 |
| 2020 | $531,170 | $531,170 to $559,950 | $209,280 | $270,400 |

**ANALYSIS**

## I. Challenges to the jury's median appraised valuations

In its first two issues, the District has combined numerous complaints regarding its argument that the trial court erred by adopting the jury's property value findings for 2019 and 2020. An issue on appeal addressing more than one specific ground of error is multifarious. *Shull v. United Parcel Serv.*, 4 S.W.3d 46, 51 (Tex. App.—San Antonio 1999, pet. denied). "We may disregard any issue on appeal that is multifarious." *Matthews v. Matthews*, No. 04-16-00609-CV, 2017 WL 4518295, at *3 (Tex. App.—San Antonio Oct. 11, 2017, no pet.) (mem. op.). *See e.g.*, *Hollifield v. Hollifield*, 925 S.W.2d 153, 155 (Tex. App.—Austin 1996, no writ) (overruling appellant's sole point of error on this basis). Alternatively, we may consider a multifarious issue if we can determine, with reasonable certainty, the alleged error about which complaint is made. *Prihoda v. State*, 352 S.W.3d 796, 801 (Tex. App.—San Antonio 2011, pet. ref'd).

In the interest of justice, we have reviewed the sub-issues presented under the District's first two issues and we have identified, with reasonable certainty, the following alleged errors:

- The trial court erred in not excluding Owners' expert as unreliable;[1]
- There was no evidence or insufficient evidence to support the jury's property valuations;
- The trial court erred by accepting the jury's property valuations because the jury was not permitted to determine the property valuations, as it was limited to choosing between the property valuations presented by the opposing expert witnesses.

Accordingly, we address only these issues and, to the extent the District attempted to raise other issues relating to the jury's property valuations, we find they have been waived. *See*, *e.g.*, *Martin v. Bravenec*, No. 04-14-00483-CV, 2015 WL 2255139, at *3 (Tex. App.—San Antonio May 13, 2015, pet. denied) (addressing only the issues identified with reasonable certainty).

A. The trial court's admission of Craig's expert testimony was not error.

The District asserts the trial court erred by not excluding Craig's expert testimony, arguing that Craig's methodology was unreliable. We disagree.

***Legal Standard***

We review a trial court's decision to admit or exclude expert testimony under an abuse of discretion standard. *K–Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360 (Tex. 2000); *see also Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001) ("The trial court has *broad* discretion to determine admissibility, and we will reverse only if there is an abuse of that discretion.") (emphasis added). "To determine if there has been an abuse of discretion, we look to see 'whether the trial court acted without reference to any guiding rules or principles.'" *McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*, 138 S.W.3d 24, 29 (Tex. App.—San Antonio 2004, no pet.) (quoting *United Blood Serv. v. Longoria*, 938 S.W.2d 29, 31 (Tex. 1997)). "A two-part test governs whether expert

---

[1] This argument is also presented as the District's third issue.

testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and be based on a reliable foundation." *Helena*, 47 S.W.3d at 499.

In non-scientific cases such as this one, the trial court ultimately has discretion to determine how to assess reliability. *Harris Cnty. Appraisal Dist. v. Houston Laureate Associates Ltd.*, 329 S.W.3d 52, 57 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). "Faced with nonscientific expert testimony, the trial court must evaluate the principles, research, and methodology underlying the expert's conclusions." *Ramirez v. Mansour*, No. 04-06-00536-CV, 2007 WL 2187103, at *4 (Tex. App.—San Antonio Aug. 1, 2007, no pet.) (mem. op.) (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 725 (Tex. 1998)). "An expert must show a connection between the data relied upon and the opinion offered." *Id.* (citation omitted). In determining whether an expert's research and analysis is based on a reliable foundation, "[t]he trial court is not to determine whether an expert's conclusions are correct, but only whether the analysis used to reach them is reliable." *Gammill*, 972 S.W.2d at 728; *see also State Farm Lloyds v. Mireles*, 63 S.W.3d 491, 494 (Tex. App.—San Antonio 2001, no pet.) (same). "Appraising property is not an exact science based on set mathematical formulas. It is not error for an appraiser to use his or her personal experience and expertise to make certain determinations." *Harris Cnty. Appraisal Dist. v. Kempwood Plaza Ltd.*, 186 S.W.3d 155, 161 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

### *Analysis*

The District's assertion that Craig's methodology was unreliable is based on Criag's decision to treat the 240,000 square foot SAWPM cold-storage facility as a single property for the purposes of selecting comparable properties, and then, after determining a median appraised value

from the comparables he selected, apportioning the resulting valuation of the SAWPM facility to the sixty individual units.[2]

But underlying Craig's decisions is the fact that SAWPM's condominium regime is a unique ownership structure that has created individually owned and taxable properties (4,000 square feet cold-storage units) that exist nowhere else in Bexar County.

The District argues that only Wood's approach—comparing each subject property to the other fifty-nine units—was reasonable. But Craig explained he did not consider the other condominiums as comparables because they are "the subject property." Likewise, while Wood used the other fifty-nine Subject Properties as comparables, he testified that he had never before used subject properties as comparables for another subject property in an equal and uniform valuation appraisal report.

The record shows that Wood excluded seven potential comparables because of their age and/or their size (too large). But these two factors may be part of the "appropriate adjustments" required under section 42.26(a)(3). *See Houston Laureate*, 329 S.W.3d at 58 (noting the propriety of adjusting "appraised values based on factors such as size, age, and location" in a section 42.26(a)(3) comparison).[3] Additionally, in 2017, the Supreme Court of Texas noted that the text of section 42.26 rejects the notion that comparables must be identical to the subject property.

> As we noted at the outset, the Tax Code provides that "a property is appraised unequally if [its] appraised value . . . exceeds the median appraised value of a reasonable number of comparable properties appropriately adjusted." The statutory acknowledgment that properties may need to be "appropriately adjusted" shows that "comparable" does not mean "identical." The Tax Code only requires that the selection of comparable properties be based on generally accepted methods.

---

[2] The District also asserts that Craig admitted he had no authoritative support for his methodology, but reviewing the record we find that Craig's testimony, in context, does not make that admission.

[3] Texas courts have repeatedly recognized that there is no set formula for making the "appropriate adjustments" required by section 42.26. *See, e.g.*, *Amreit SSPF Preston Towne Crossing LP v. Collin Cent. Appraisal Dist.*, No. 05-19-00185-CV, 2020 WL 1921685, at *4 (Tex. App.—Dallas Apr. 21, 2020, no pet.) (mem. op.) ("The statute provides no instruction concerning the nature of an "appropriate adjustment," leaving that to an appraiser's discretion and expertise.").

*Valero Ref.-Tex., L.P. v. Galveston Cent. Appraisal Dist.*, 519 S.W.3d 66, 74 (Tex. 2017) (quoting

TEX. TAX CODE § 42.26(a)(3) and citing TEX. TAX CODE § 23.01(f)).[4]

In *Valero*, the Court rejected the taxing authority's argument that the uniqueness of the

subject property (an oil refinery with limited production capacity) precluded using larger refineries

in the district as comparables under section 42.26(a)(3). Instead, the Court focused on the similarity

of subject properties' business functions and noted that the exclusion of these comparables would

deprive an owner's right to challenge an unequal appraisal.

> The District argues that no two refineries are really the same, and that some, but not all, are comparable. While it is certainly true that every piece of real estate is unique, and the same is no doubt true of complex properties like oil refineries, that uniqueness does not preclude similar properties from being compared. *The District's view of comparability would deny refinery owners a claim that their constitutional right to fair and equal taxation had been denied*. The District also argues, less broadly, that there is no evidence in this record that the Marathon refinery, with much less capacity and complexity than Valero's and BP's refineries, is comparable to them. *But Valero presented evidence that the three refineries each had the same business functions* (processing crude oil), similar storage facilities, equal access to utilities, and on-site support facilities

*Valero*, 519 S.W.3d at 74 (emphasis added).

The *Valero* decision supports Craig's decision to use larger cold-storage facilities given

the lack of similarly sized comparables in Bexar County. Further, it provides some support for

examining how SAWPM operates as a business in order to select comparable facilities.[5]

Additionally, the record reflects that Craig reviewed the District's appraisal records and selected

comparable properties based on the District's classification of property types and descriptions.[6] In

---

[4] Section 23.01(f) simply provides that generally accepted appraisal methods and techniques must be followed in a 42.26(a)(3) analysis. *See* TEX. TAX CODE § 23.01 (f) ("The selection of comparable properties and the application of appropriate adjustments for the determination of an appraised value of property by any person under Section 41.43(b)(3) or 42.26(a)(3) must be based on the application of generally accepted appraisal methods and techniques. Adjustments must be based on recognized methods and techniques that are necessary to produce a credible opinion.").
[5] Accordingly, we reject the District's assertion that Craig had no support for including SAWPM's business model, as a "coordinate, cohesive facility" in his methodology.
[6] Conversely, Wood did not review any of the District's appraisal records when searching for comparable properties. Instead, he used a database called "CoStar" to identify eight cold storage facilities in San Antonio.

*Valero*, the Court recognized that "[t]he District's use of similar accounts and appraisal methods itself shows a measure of comparability." *Id*.

Finally, after adjusting for factors including age, location (access and exposure), quality (features and construction), land-to-building ratios, and cold storage capacity, Craig arrived at a per-square-foot median appraised value for the comparable properties. He then multiplied that number by 240,000 to arrive at a median appraised value for the SAWPM facility and then divided that number by sixty to allocate the median appraised value among the Subject Properties.

We do not agree with the District's contention that apportioning the appraised value in this manner is contrary to law and, therefore, unreliable. First, the District has not presented a single case to support this position. Second, Fernando Narvaez, SAWPM's property manager, testified that under the condominium declarations, each Owner is responsible for paying its portion of the taxes assessed on the common elements of the SAWPM facility.

> Q Sir, on page 8 of the declaration that I've handed you, it says ad valorem assessment and taxation. Do you see that?
> A Yes.
> Q And it says: "Declarant," which would be Abasto, "shall give written notice to the assessor of the creation of the condominium ownership of this property as is provided by law so that each condominium unit and its percentage of an undivided interest in the general common elements shall be deemed as a separate parcel and subject to separate assessment and taxation."
> . . . .
> And the reason they had to notify the tax assessor collector is so that *each condominium **and** its percentage of its undivided 1/60th is deemed as a separate parcel subject to separate taxation and valuation*, correct?
> A Yes.[7]

The District has confirmed that in the individual accounts established for the condominium units, "[t]he units include a 1/60th undivided interest in commonly owned areas including but not limited to the land itself." In other words, the appraised and assessed values of the commonly owned

---

[7] Emphasis added.

elements of the SAWPM property is *allocated by the District* to the sixty separately owned units. By apportioning the taxes assessed on the common elements of the SAWPM facility to the individual condominiums—rather than maintaining a separate account for those taxes—the District has tacitly recognized the propriety of allocating the appraised value, and resulting taxation, to the sixty units.

Finally, we note that the Craig's appraised value for each condominium would have been the same if he had taken the per-square-foot median appraised value for the comparable properties and simply multiplied it by 4,000—the number of square feet in each unit—as Wood did. Accordingly, Craig's allocation method did not alter the resulting median appraised value of any of the Subject Properties.

We conclude the problems the District points out do not amount to an analytical gap in Craig's analysis. Therefore, we cannot say the trial court abused its discretion to determining that Craig's analysis was based upon a reliable foundation. *See Houston Laureate Associates Ltd.*, 329 S.W.3d at 57 ("In determining whether an expert's research and analysis is based on a reliable foundation, the trial court does not decide whether the expert's conclusions are correct; instead, the trial court must determine whether the analysis used to reach those conclusions is reliable.").

B.      Craig's expert testimony was sufficient to support the jury's findings.

The District asserts that no evidence or insufficient evidence supports the jury's findings that the Subject Properties had been unequally appraised and the jury's valuations for the Subject Properties. We disagree.

### Legal Standard

Generally, in reviewing a no evidence claim, we view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary.

*Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002). "If more than a scintilla of evidence exists to support the finding, the no evidence challenge fails." *DiMiceli v. Affordable Pool Maint., Inc.*, 110 S.W.3d 164, 168 (Tex. App.—San Antonio 2003, no pet.) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors,* 960 S.W.2d 41, 48 (Tex. 1998)). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id*. (citing *Minyard,* 80 S.W.3d at 577).

However, if a party asserts on appeal that unreliable scientific evidence or expert testimony is not only inadmissible, but also that its unreliability makes it legally insufficient to support a verdict, "a no-evidence review encompasses the entire record, including contrary evidence tending to show the expert opinion is incompetent or unreliable." *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009).

"In reviewing a factual insufficiency point, we consider and weigh all of the evidence in the case and reverse only if the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Computize*, 2004 WL 86143, at *2 (citing *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1998)). "[H]owever, we may not pass on the credibility of the witnesses or the weight given their testimony, and we may not interfere with the jury's resolution of conflicts in the evidence." *Am.'s Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 628 (Tex. App.—San Antonio 1996, writ denied).

"In conducting a factual sufficiency review, we must not substitute our judgment for that of the jury, even if the evidence would clearly support a different result, and the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony." *Computize*, 2004 WL 86143, at *2 (citing *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex. 1998)).

*See also Samaras*, 929 S.W.2d at 628-29 ("Where conflicting evidence is presented, we are not called upon to reweigh the evidence; thus, the jury's verdict on such matters is generally considered to be conclusive."). "We set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust." *DiMiceli*, 110 S.W.3d at 169 (citing *Cain*, 709 S.W.2d at 176).

## *Analysis*

The District challenges both the legal and factual sufficiency of the evidence to support the jury's finding that the Subject Properties had been unequally appraised and the jury's valuations for the Subject Properties. The District asserts no evidence supports the jury's findings because Wood's testimony purportedly demonstrated that Craig's methodology was unreliable. The District further argues the only reliable evidence—Wood's expert opinion that the Subject Properties were not unequally appraised and his valuations of same—was insufficient to support the jury's contrary findings.

However, as discussed above, we have already determined that the trial court did not abuse its discretion in finding that Craig's testimony was reliable. While expert testimony may be used to prove the opposing expert's evidence is unreliable—and therefore legally insufficient to support a jury's verdict—we do not find that Wood's testimony demonstrated that Craig's expert evidence was unreliable. Accordingly, we find that Craig's expert testimony was legally sufficient to support the jury's finding.

For the same reason, we find that the evidence was factually sufficient to support the jury's verdict. *See Banquete Indep. Sch. Dist. v. Tenneco, Inc.--Tennessee Gas Pipeline Div.*, 618 S.W.2d 824, 828 (Tex. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.) ("The appraisal testimony of Mr. Green constituted some evidence which the jury was entitled to consider in determining the market

value of the property in question, and it was within the province of the jury to determine the weight to be given his testimony.") (citing *Texas Electric Service Co. v. Wheeler*, 551 S.W.2d 341, 342 (Tex. 1977)).

This case boils down to a battle of the experts, and the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See Maritime Overseas Corp.*, 971 S.W.2d at 407; *Samaras*, 929 S.W.2d at 628-29. A finding of sufficiency is also supported by the fact that the jury's valuations fell within the range provided by Craig's valuations and Wood's valuations. *See Calhoun/Holiday Place, Inc. v. Wells Fargo Bank, N.A.,* No. 01-14-00872-CV, 2016 WL 7671372, at *5–6 (Tex. App.—Houston [1st Dist.] Dec. 22, 2016, pet. denied) (mem. op. on reh'g) (holding that evidence was legally and factually sufficient to support jury's verdict of market value because finding was within range of evidence presented at trial); *see also Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 49 (Tex. App.—San Antonio 2006, no pet.) ("The jury generally has broad discretion to award damages within the range of evidence presented at trial.").

Additionally, Craig's selection of comparable properties was based in part on the classification of property types and descriptions used by the District. This amounts to some evidence that would support a jury's decision to place more reliance on the comparable properties chosen by Craig. *See Valero*, 519 S.W.3d at 74 ("The District's use of similar accounts and appraisal methods itself shows a measure of comparability. This was some evidence to support the

jury's finding that Marathon was a comparable facility for the purpose of an equal-and-uniform challenge.").[8]

Even if the trial court had excluded Craig's testimony, the record contains sufficient evidence to support the jury's verdict. Wood testified that the median appraised values for the Subject Properties were between $250,000 to $263,607 for 2018. While he provided testimony that those values doubled to $510,350 to $538,065 for 2019 (and increased again in 2020), it was within the province of the jury to determine the weight to be given to his testimony. *See Barrajas v. VIA Metro. Transit Auth.*, 945 S.W.2d 207, 209 (Tex. App.—San Antonio 1997, no writ) ("[A] jury may choose to be guided by expert testimony on damages, but it is not bound by it. In fact, the jury may disbelieve a witness . . . even though his testimony is not contradicted.") (citations omitted). "It is fundamental that a jury may blend the evidence admitted before it and believe all, some or none of a witness's testimony." *State Farm Fire & Cas. Co. v. Rodriguez*, 88 S.W.3d 313, 321 (Tex. App.—San Antonio 2002, pet. denied), *abrogated on other grounds*, *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20 (Tex. 2008).

Accordingly, the jury may have found Wood's 2018 median appraised valuations for the Subject Properties credible while still rejecting his appraised valuations for 2019 and 2020. The jury's more modest increases in median appraised value for those years still fall between $250,000 and $559,950, the range of values presented by Wood for tax years 2018-2020. *See Aspenwood Apartments Partners, LP v. Harris Cnty. Appraisal Dist.*, No. 01-20-00335-CV, 2022 WL 1249956, at *14 (Tex. App.—Houston [1st Dist.] Apr. 28, 2022, no pet.) (mem. op.) (upholding

---

[8] Craig's selection of comparables also included cold-storage facilities that directly compete with SAWPM, which operates as a cohesive, coordinated, cold-storage facility that provides mixed-loads of produce for its customers. Conversely, while Wood testified that a customary first step in undertaking an appraisal report is to ask what properties the subject property competes with, he admitted he did not seek information regarding who SAWPM's competitors were, and did not even know what a "mixed-load" was.

jury verdict where property owner provided the only evidence on equal and uniform value and jury verdict departed from that valuation).

Finally, the District asserts there was no evidence or insufficient expert evidence to support the jury's median appraised values for the Subject Properties in 2019 and 2020.

> [N]o evidence or insufficient evidence supports that the condos' median appraised values could be found by using a prior-year's certified values of $250,000 and applying a 4% increase to calculate a median of $260,000 per condo for 2019. No evidence or insufficient evidence supported taking the Jury's 2019 calculation and applying the same 4% increase to arrive at $270,400 per condo for 2020. Further, there was no evidence or insufficient evidence that a median appraised value could be determined by a percentage increase to a prior-year's certified values. No expert testified and no other evidence supported a percentage increase to a prior-year's certified value of any amount to determine a median appraised value for a subsequent year.

While posited as an evidentiary complaint, the District actually challenges the jury's purported methodology. But the jury's methodology is not before us. *See First Nat. Bank in Dallas v. Zimmerman*, 442 S.W.2d 674, 678 (Tex. 1969) ("The jury's reasons for reaching a particular verdict are irrelevant, at least in the absence of some overt act of misconduct."); *Vela*, 203 S.W.3d at 48-49 (Tex. App.—San Antonio 2006, no pet.) ("[T]he mental process by which the jury determined the amount of the verdict is ordinarily not cognizable by an appellate court . . . and the reviewing court is not permitted to speculate on how the jury actually arrived at its award.").

Although the evidence in this case may have supported a different result, we are not permitted to substitute our judgment for that of the jury. *Computize*, 2004 WL 86143, at *2. The jury's valuations are within the range of trial evidence and, therefore, are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Accordingly, we conclude the evidence is legally and factually sufficient to support the jury's findings.

C.     <u>It is the jury's province to determine the median appraised value.</u>

The District asserts the trial court erred by accepting the jury's property valuations because, it argues, the jury is not qualified to calculate median appraised values on its own. We disagree.

*Analysis*

Because the jury's median appraised values differed from the values proffered by Wood and Craig, the District concludes the jury improperly determined the valuations on its own. The District argues this is error, asserting the jury is not permitted to determine the median appraised values of the Subject Properties because the members are not qualified to apply recognized appraisal methods and techniques, find comparable properties, and make appropriate adjustments—as required for an equal-and-uniform analysis. *See* TEX. TAX CODE §§ 23.01; 42.26(a)(3). The District concludes that the jury was therefore limited to choosing either Wood's or Craig's valuations.

We recognize that "[a]ppraisal expertise is a form of 'specialized knowledge used to assist the trier of fact to determine a fact in issue.'" *Rocksprings Val Verde Wind, LLC v. Casanova*, No. 04-22-00524-CV, 2024 WL 5248451, at *4 (Tex. App.—San Antonio Dec. 31, 2024, no pet.) (quoting *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002)). It is precisely because the jury does not have this expertise that expert testimony is permitted. Despite this assistance, however, it remains the province of the jury to weigh the competing expert valuations and determine the median appraised value. *See Aspenwood Apartments Partners, LP.*, 2022 WL 1249956, at *14 (upholding jury verdict that departed from only evidence on equal and uniform value); *see also Vela*, 203 S.W.3d at 51 ("The jury was not required to unquestioningly accept Howell's damages model, but was entitled to make credibility determinations and weigh the competing expert testimony about Howell's model and the variables and assumptions upon which

it was based."); *Am.'s Favorite Chicken Co.*, 929 S.W.2d at 629 (noting "[t]he jury was free to weigh this evidence in light of the various issues raised as to each party's model" and upholding verdict where "[t]he jury did not unquestioningly accept the testimony of [plaintiff's] expert but reduced the amount of damages presumably based on certain challenges made by [defendant] to the expert's model"); *see also Bexar Cnty. Appraisal Dist. v. Abdo*, 399 S.W.3d 248, 259 (Tex. App.—San Antonio 2012, no pet.) (holding that a jury instruction which quotes the language of section 42.26(a)(3) "requires the jury to determine the equal and uniform value in comparison to comparable properties appropriately adjusted.").

The District has not identified, nor have we found, any Texas case supporting the District's assertion that a jury's role in an unequal appraisal case is more limited than in a market value case or any other valuation case—in which the jury has the ability to assign a valuation within the range of evidence presented. *See Calhoun/Holiday Place, Inc.,* 2016 WL 7671372, at *5–6 (upholding jury's verdict of market value because finding was within range of evidence presented at trial); *Aspenwood Apartments Partners, LP.*, 2022 WL 1249956, at *11 (upholding jury's determination of market value which was "within the range of evidence presented at trial"). To hold otherwise would take away the jury's role as the factfinder under section 42.26(a)(3) of the Tax Code.[9]

Accordingly, we conclude the trial court did not err when it adopted the jury's valuations of the Subject Properties for 2019 and 2020. The District's first two issues are overruled.

---

[9] Contrary to the District's assertions, we find nothing in the text of section 42.26(a)(3) to indicate that a jury's valuation must be an either/or choice between opposing expert valuations rather a valuation that falls within the range of evidence presented at trial. The District's assertion also conflicts with section 42.26(b). *See* TEX. TAX CODE § 42.26(b) ("The court shall determine each applicable median level of appraisal or median appraised value according to law, and *is not required to adopt the median level of appraisal or median appraised value proposed by a party to the appeal*.") (emphasis added).

## II.     Challenges to the Owners' expert

In its third issue, the District asserts the trial court erred by not excluding Owners' expert as unreliable. As addressed above in Section I(A), we cannot say the trial court abused its discretion to determining that Craig's analysis was based upon a reliable foundation. Accordingly, the District's third issue is overruled.

## III.     Challenges to evidentiary rulings

In its fourth issue, the District asserts the trial court committed harmful error by: 1) admitting evidence of the District's certified appraised values of the Subject Properties; 2) ordering the District to present its expert to authenticate one of Owners' exhibits; and 3) excluding evidence of the recent sales prices of certain Subject Properties. We disagree.

### *Legal Standard*

"Evidentiary rulings are committed to the trial court's sound discretion." *U-Haul Intern., Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). "A trial court abuses this discretion when it acts without regard for guiding rules or principles." *Id*. Even if a trial court abuses its discretion on evidentiary matters, "reversal is only appropriate if the error was harmful, i.e., it probably resulted in an improper judgment." *Id*.; *see also* TEX. R. APP. P. 44.1(a). "Reversible error does not usually occur in connection with evidentiary rulings 'unless the whole case turns on the particular evidence admitted or excluded.'" *In re C.C.O.*, 714 S.W.3d 198, 210 (Tex. App.—San Antonio 2024, no pet.) (quoting *McEwen v. Wal-Mart Stores, Inc.*, 975 S.W.2d 25, 29 (Tex. App.—San Antonio 1998, pet. denied). "We review the entire record and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted." *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam). Likewise, we "will not reverse a judgment because a trial court erroneously excluded evidence when the

evidence in question is cumulative and not controlling on a material issue dispositive to the case." *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

*Analysis*

A.  The trial court did not err in admitting the District's certified appraised values for the Subject Properties.

The District asserts its 2018-2020 certified appraised values for the Subject Properties should not have been admitted as evidence because an appeal of an appraisal review board ("ARB") decision is a de novo proceeding and, pursuant to section 42.23(b) no prior action by the ARB may be admitted as evidence.

But the District provides no support for its assertion that its certified appraised values are to be considered a "prior action by the appraisal review board." Instead, cases reviewing the scope of a de novo trial following state agency decisions explain that the "prior action" that may not be admitted is the prior proceeding and final decision of the reviewing agency. *See*, *e.g.*, *PR Investments & Specialty Retailers, Inc. v. State*, 251 S.W.3d 472, 476 (Tex. 2008) (explaining that in a de novo trial under Texas Property Code section 21.018 "the proceedings that occurred before the special commissioners are not considered").

Moreover, section 42.23 specifies that the reviewing court "shall try all issues of fact and law raised by the pleadings." TEX. TAX CODE § 42.23(a). *See also Sebastian Cotton & Grain*, 555 S.W.3d at 50 ("A trial de novo is '[a] new trial on the entire case—that is, on both questions of fact and issues of law—conducted as if there had been no trial in the first instance.'") (quoting BLACK'S LAW DICTIONARY (10th ed. 2014)). Given that the central issue to be determined in a de novo review under section 42.26(a)(3) is whether "the appraised value of the property exceeds the median appraised value of a reasonable number of comparable properties appropriately adjusted," it is self-evident that the appraised value of the subject property is

relevant, admissible evidence. [10] *See In re Catherine Tower*, 553 S.W.3d 679, 686 (Tex. App.—Austin 2018, orig. proceeding) (stating that for "the analysis prescribed by Section 42.26(a)(3) . . . one merely takes the appraised values of the subject property and of the comparison properties as 'found on the tax rolls' and compares them, and 'the only independent analysis required is adjusting the appraised values [of the comparison properties] to put the properties on equal footing.'") (quoting *Harris Cnty. Appraisal Dist. v. United Inv'rs Realty Tr.*, 47 S.W.3d 648, 653 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("Common sense dictates it is easier to prepare a protest by merely comparing the appraised values—found on the tax roles[.]"); *Harris Cnty. Appraisal Dist. v. Duncan*, 944 S.W.2d 706, 709 (Tex. App.—Houston [14th Dist.] 1997, writ denied) ("[T]he appraisal value to be used by the district court is simply the most current one on the tax rolls[.]"). Accordingly, we conclude the trial court did not err when it admitted the District's certified appraised values for the Subject Properties for the tax years 2018-2020.

Even if it was error to admit these appraised values, such error was harmless because it was merely cumulative of other properly admitted evidence. *See Jackson v. Takara*, 675 S.W.3d 1, 7 (Tex. 2023) ("[T]he erroneous admission of cumulative evidence or evidence that does not control a material and dispositive issue is generally harmless and thus does not require reversal of the trial court's judgment."). "In evaluating whether erroneously admitted evidence is harmless, we review the entire record, considering, in particular, the "'state of the evidence, the strength and weakness of the case, and the verdict.'" *Id*. (quoting *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008).

---

[10] We also note that jury charge questions number 1, 3, and 5 asked the jury if "the Subject Properties shown below unequally appraised by Bexar Appraisal District" for the tax years 2018, 2019, and 2020, and that the District concedes the jury charge tracked Section 42.26(a)(3).

Reviewing the entire record, we find that the District's certified appraised values for the Subject Properties were introduced through the reports and testimony of both parties' expert witnesses. First, Craig explained to the jury that the "BCAD Value" listed in his equal-and-uniform comparative analysis grids (Plaintiffs' Exhibit 5), represents the total appraised value of the sixty Subject Properties.

> What I'm stating here for 2018 of the 15 million, that's the Bexar County Appraisal District value. I'm not determining that value. What I'm doing is adding together the individual units that comprise the subject property to arrive at this number.
> . . . .
>
> Q Is the BCAD value on your appraisal grids on page 46, is that simply just for ease of referring to the BCAD value for all of the 60 accounts together?
>
> A Yes.

Additionally, Craig's grid also included the District's appraised values for the Subject Properties broken down to the square foot--$62.50 for 2018, $127.59 for 2019, and $127.80 for 2020.

Second, because Wood only used the fifty-nine other Subject Properties as comparisons for each of the Subject Properties, his "adjustments" were to the District's appraised values for those properties, broken down to the square foot. Accordingly, Wood explained that a zero percent adjustment on his Adjustment Grid meant that the "Adjusted Appraised Value/SF" was the District's appraised value for that property.

> The $62.50, that was the appraised value from the District. . . . Add zero percent to that and you get $62.50.

Therefore, as with Craig's appraisal grid, Wood's grid (Defendant's Exhibit 18) contained the appraised values for the Subject Properties broken down to the square foot--$62.50 for 2018,

$127.59 for 2019, and $127.80 for 2020. Accordingly, we find that the appraised values for the Subject Properties in Plaintiffs' Exhibit 13 were merely cumulative of other admitted evidence.[11]

B. It was not error to have Wood authenticate Plaintiffs' Exhibit 13.

The District asserts the trial court erred by allowing the Owners to call Wood, the District's expert witness, to authenticate Plaintiffs' Exhibit 13. The District contends that, pursuant to Rule 193.6(a), the Owners' failure to designate Wood as a witness, or subpoena him to testify, should foreclose introduction of Wood's testimony at trial. But the District's position ignores the fact that Wood's testimony became necessary only when the District challenged the authenticity of a portion of its own expert report, prepared by Wood.

"Under Rule 193.6, a party may not offer testimony from a witness that was not timely identified unless the trial court finds that (1) there was good cause for the failure or (2) the failure 'will not unfairly surprise or unfairly prejudice the other parties.'" *Jackson v. Takara*, 675 S.W.3d 1, 6 (Tex. 2023) (quoting TEX. R. CIV. P. 193.6(a)). "Thus, once it is determined that the witness was not timely designated, a trial court must inquire whether there is (1) good cause for failing to timely identify the witness or (2) a lack of unfair surprise or unfair prejudice." *Id*. The burden of establishing this exception is on the party seeking to call the witness or introduce the evidence. TEX. R. CIV. P. 193.6(b).

However, in *Alvarado v. Farah Mfg. Co.*, the Supreme Court of Texas recognized "there may be circumstances in which good cause can be shown for admitting testimony of an undisclosed witness . . . as for example *when the need for the testimony could not reasonably have been*

---

[11] Even if the evidence had not been cumulative, Wood later testified that Plaintiff's Exhibit 13 had a typo, and corrected it by verifying that the BCAD value of $250,000 was the appraised value for the Subject Properties in 2018 rather than 2019. Accordingly, we also reject the District's contention that Plaintiffs' Exhibit 13 was the only source of evidence for the jury to determine $250,000 as a starting point for determining the median appraised values for 2019 and 2020.

*anticipated*[.]" 830 S.W.2d 911, 916 n.6 (Tex. 1992) (emphasis added). Then, in *Aluminum Co. of Am. v. Bullock*, the Court applied this exception to find the trial court acted within its discretion in allowing defendant Aluminum Company of America ("Alcoa") to call expert witnesses it had not designated—but that had been designated by the plaintiffs and a co-defendant—to provide rebuttal testimony when another of plaintiffs' experts changed her testimony at trial. 870 S.W.2d 2, 3-4 (Tex. 1994).

> A party's failure to supplement discovery to disclose a material change in an expert's opinion may provide good cause for an adverse party's failure to designate rebuttal experts who become necessary only to counter the unanticipated testimony. Rule 166(h), for example, allows a court to set a pretrial order requiring parties to exchange a list of witnesses *expected* to be called at trial, but specifically excepts "rebuttal or impeaching witnesses the necessity of whose testimony cannot reasonably be anticipated before the time of trial." Likewise, Rule 166b(6)(b) requires the parties to supplement only those experts "the party *expects* to call.". . . . We hold, based on all of the facts before us, that the trial court acted within its discretion when finding that Alcoa met its burden of showing good cause for allowing the experts' testimony in rebuttal of a material and unanticipated change in testimony.

*Id*., at 4 (citations omitted).

In the case at bar, Owners sought to introduce excerpts from Wood's expert report that contained the District's certified appraised values for the Subject Properties. In response, the District unexpectedly argued that its own expert's report was not authentic. We find that it was within the trial court's discretion to have Wood testify to address this unanticipated circumstance.

Even if it was error to have Wood testify, such error was harmless. As discussed in the previous section, the appraised values in Plaintiffs' Exhibit 13 were cumulative of other properly admitted evidence. Accordingly, any error in having Wood authenticate the exhibit was harmless. *See Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989) ("The erroneous admission of testimony that is merely cumulative of properly admitted testimony is harmless error.").

C.  It was not error to exclude recent sales prices of some of the Subject Properties.

The District asserts the trial court erred by excluding the recent sales prices of some of the Subject Properties—arguing that the information was necessary rebuttal evidence to explain the rise in certified appraised values shown in Plaintiffs' Exhibit 13. In support of its position, the District cites *Waldrep v. Tex. Emp'rs Ins. Assoc*, for the proposition that evidence that may be initially inadmissible may become relevant and admissible in rebuttal. 21 S.W.3d 692, 706 (Tex. App.—Austin 2000, pet. denied). However, *Waldrep* continues: "[b]ut the alleged rebuttal evidence must be in fact offered to *rebut* other evidence, not as a part of the proponent's case-in-chief." *Id*.

At no point in the record does the District refer to this as rebuttal evidence. Instead, the District argued to the trial court that the sales prices were necessary because of comments made in Owners' opening statements.

> Your Honor, one of the motions in limine was we were not supposed to talk about sales prices of any of the subject property pretrial. However, during opening statement, Ms. Michel said you're going to see that the value increased from $250,000 per unit to over $500,000 a unit. That's an increase of over 100 percent, and no one's going to be able to explain why. Well, the why is we have sales of these things of over half a million dollars. . . She didn't just say the appraised value doubled. She said, And [sic] no one can tell you why. And then -- so that's one issue. The second issue is when she identifies, What's to stop them? We have to identify that what stops the Appraised District from going up indefinitely is they're limited to sales prices, to market value. . . . She opened the door to this. . . . She posed the question. We should have the right to answer it.

But "[r]ebuttal evidence is limited . . . and goes only to disprove *facts* already in evidence by an adverse party." *In re Spotted Lakes, LLC*, No. 04-23-00815-CV, 2024 WL 463348, at *4 (Tex. App.—San Antonio Feb. 7, 2024, no pet.) (mem. op.) (quoting *In re Bledsoe*, 41 S.W.3d 807, 813 (Tex. App.—Fort Worth 2001, orig. proceeding)) (emphasis added). Therefore, because the argument of counsel is not evidence, rebuttal evidence is not available to counter the bare

assertions of counsel. *Spotted Lakes*, at \*4. Accordingly, it was not an abuse of discretion for the trial court to exclude the sales prices offered as rebuttal evidence.[12]

However, the granted motion in limine mentioned by the District's counsel—which excluded the sales price evidence—was based on *Catherine Tower*, which held that market value evidence is not relevant in an equal and uniform challenge under section 42.26(a)(3). *See Catherine Tower*, 553 S.W.3d at 685–87. But, after the parties' briefing in this matter had been submitted, the Supreme Court of Texas expressly disapproved of *Catherine Tower* and other "courts of appeals cases to the extent they suggest that market value of the subject property is per se irrelevant in unequal-appraisal litigation." *Tex. Disposal Sys. Landfill, Inc. v. Travis Cent. Appraisal Dist. by & through Crigler*, 694 S.W.3d 752, 762 n.58 (Tex. 2024) (citations omitted).[13]

> [E]ven though the Tax Code limits the trial court's determination in this case to an appraisal amount that is equal and uniform, evidence of a subject property's fair market value is relevant to both the taxpayer's challenge and the trial court's duty to set the subject property's appraised value at an equal and uniform amount, which as we have said, should approach the property's market value. . . . Thus, evidence of the subject property's fair market value is admissible in either kind of taxpayer protest[.]

*Id*., at 762. Because, *Texas Disposal* eliminates the prior understanding that fair market value evidence was irrelevant to the underlying proceeding, the District filed supplemental briefing with this Court asserting the sales prices should have been admitted as relevant market value evidence.

But *Texas Disposal* does stand for the proposition that the recent sales prices were automatically relevant, admissible evidence of fair market value. As noted above, SAWPM's

---

[12] We also note again that, as discussed above, Wood's testimony and his Adjustment Grid both contained evidence of the appraised valuations. Accordingly, the admission of Plaintiffs' Exhibit 13 was cumulative of the District's own evidence—so rebuttal evidence was not warranted.

[13] Because the *Texas Disposal* decision is to be applied retroactively, we will evaluate its implications for the matter before us. *See Interest of J.O.L.*, 668 S.W.3d 160, 164–65 (Tex. App.—San Antonio 2023, pet. denied) ("As a general rule, judicial decisions, including those of the Texas Supreme Court, apply 'retroactively' to preexisting cases that have not yet been concluded by a final judgment and exhaustion of direct appeals.") (citations omitted); *Engelman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 748–50 (Tex. 2017) (same).

condominium regime is a unique ownership structure and there are no similarly sized, cold-storage condominium units in Bexar County. Therefore, any such sales will be rare and may not reflect a fair market value. *See Polk Cnty. v. Tenneco, Inc.*, 554 S.W.2d 918, 921 (Tex. 1977) ("Segments of natural gas pipelines . . . are rarely sold; and their market value therefore generally cannot be determined by comparing the prices brought by sales of similar properties."); *Grand Prairie Indep. Sch. Dist. v. Missouri Pac. R. Co.*, 730 S.W.2d 761, 762 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) ("Although the market value approach has great weight in the appraisal of the typical urban single dwelling, it is inherently difficult to apply in the valuation of railroad rights of way because they are rarely sold and, even when sold, are very difficult to compare to one another. The practice of determining the value of railroad right-of-way through comparable sale has been criticized by the courts.") (collecting cases). Accordingly, the trial court could have determined that the sales prices were of limited value and, as stated in its order on Owners' motion in limine, "highly prejudicial."

Further, the *Texas Disposal* Court did ***not*** give a blanket endorsement of relevance to all fair market value evidence. Instead, it noted that in a taxpayer challenge under section 42.26(a)(3), the market values of the subject property *and* comparable properties must have "appropriate adjustments."

> The Tax Code provides three formulas for use in determining whether an appraisal is equal and uniform. . . . The third formula compares "the appraised value of the property" and "the median appraised value of a reasonable number of comparable properties appropriately adjusted." *Implicit in this third formula are appropriate adjustments to the market value of comparable properties, in a manner similar to appropriate adjustments to the market value of the subject property, making their respective appraised values "comparable properties appropriately adjusted."* Thus, evidence of the subject property's fair market value is admissible in either kind of taxpayer protest to support or challenge the appropriateness of comparable properties and the adjustments made in determining whether the appraised value is equal and uniform. *Using evidence of appropriately adjusted fair market values*, the District is free to counter the taxpayer's suggested equal and uniform value of comparable properties[.]

*Tex. Disposal,* 694 S.W.3d at 762 (emphasis added). Here, the selective presentation of recent, unadjusted sales prices—absent sales information for all the comparable properties and "appropriate adjustments" thereto—falls short of the analysis required for an equal and uniform valuation under section 42.26(a)(3).

Even if we were to assume that recent sales prices of certain Subject Properties would amount to relevant fair market value evidence, we find that the exclusion of this evidence was harmless. As explained in *Texas Disposal*, "to the extent that the fair market value of the subject property deviates from its equal and uniform appraised value, the [owner] is entitled to the lower of the two amounts for calculating the property tax it owes." *Tex. Disposal,* 694 S.W.3d at 761. Continuing, the Court stated that "if the fair market value of the property is higher—as both parties seem to presume—that value must yield to the lower equal and uniform value as assessed on comparable properties." *Id.*, at 761-62.

Here the District asserts that recent sales prices would have supported a fair market value of over $500,000 for each of the Subject Properties. Assuming a jury agreed to that assessment, or any fair market value higher than the jury's median appraised valuation, the fair market value would be discarded in favor of the lower equal and uniform value determined by the jury. *Id.*, at 761-62. Accordingly, the District cannot demonstrate that the judgment in this case turns on the excluded evidence, and we cannot find that the exclusion of this evidence probably resulted in an improper judgment. Therefore, we conclude any error was harmless. *U-Haul Intern.*, 380 S.W.3d at 132. The District's fourth issue is overruled.

## IV. Challenges to this Court's precedent in *Zapata*.

### A. *Zapata* remains the precedent of this Court.

In its fifth issue, the District asserts that this Court's prior interpretation of section 42.29 of the Texas Tax Code—finding that an award of attorney's fees is mandatory if the taxpayer

prevails on an appeal of an excessive appraisal—was in error. *See Zapata Cnty. Appraisal Dist. v. Coastal Oil & Gas Corp.*, 90 S.W.3d 847, 854 (Tex. App.—San Antonio 2002, pet. denied). However, we are bound to follow our precedent in *Zapata*. *See Mitschke v. Borromeo*, 645 S.W.3d 251, 256 (Tex. 2022) (explaining that under the principle of horizontal stare decisis, "three-judge panels must follow materially indistinguishable decisions of earlier panels of the same court unless a higher authority has superseded that prior decision."). The District's fifth issue is overruled.

B. Charge Question No.7 was not submitted in error.

In a related challenge, the District asserts the trial court abused its discretion when it submitted Question 7 to the jury contending that, "[a]s submitted, Question No. 7 misled the Jury that fees were mandatory and gave them no choice but to write in some number for attorney's fees." However, under *Zapata*, an award of attorney's fees is mandatory if the taxpayer prevails on an appeal of an excessive appraisal. *Zapata*, 90 S.W.3d at 854. Accordingly, we reject the District's argument that Question No. 7 misled the jury.

## V. Challenges to the Owners' evidence of attorney's fees.

In its sixth issue, the District raises several complaints regarding the attorney's fees awarded by the trial court: 1) the evidence was insufficient to support the award of attorney's fees; 2) Owners had no evidence to support their award of attorney's fees because they failed to segregate their fees among the individual Subject Properties or for the three separate years of valuations at issue; and 3) the trial court abused its discretion when it considered tax rates—necessary for calculating a cap on any attorney's fees awards—that Owners failed to present evidence of at trial. [14]

---

[14] The District also challenged the propriety of Charge Question No. 7 in the jury charge as part of its sixth issue. However, we addressed that complaint in the prior section given our reliance on *Zapata*.

A. Evidence supports the award of attorney's fees.

First, the District asserts the Owners' evidence was insufficient to support the award of attorney's fees. We disagree.

### *Legal Standard*

Evidence must support any award of attorney's fees. *Diaz v. Diaz*, 350 S.W.3d 251, 257 (Tex. App.—San Antonio 2011, pet. denied); *see also Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991) (noting "the trial court may award those fees that are 'reasonable and necessary' for the prosecution of the suit"). "To support an award of reasonable attorney's fees, there should be evidence of the time spent by the attorney on the case, the nature of the preparation, the complexity of the case, the experience of the attorney, and the prevailing hourly rates." *In re M.A.N.M.*, 231 S.W.3d 562, 567 (Tex. App.—Dallas 2007, no pet.). "However, 'evidence on each of these factors is not necessary to determine the amount of an attorney's fee award.'" *Id.* (quoting *Sandles v. Howerton*, 163 S.W.3d 829, 838 (Tex. App.—Dallas 2005, no pet.). "The court may also consider the entire record and the common knowledge of the lawyers and judges." *Rust v. Rust*, No. 04-17-00674-CV, 2018 WL 4760157, at *7 (Tex. App.—San Antonio Oct. 3, 2018, no pet.) (mem. op.).

### *Analysis*

The Owners' attorney, Lorri Michel, provided sworn testimony that she has practiced in the area of property tax for thirty-one years, and has handled over 1,000 property tax cases. She testified that in 2018 she agreed to represent the Owners at a rate of $300 per hour, $100 dollars an hour below her normal rate at that time and $200 per hour below her normal rate of $500 by the

time this matter reached trial in 2022.[15] Michel testified that $300 per hour is a reasonable hourly rate for a property tax attorney with her experience. Michel also testified that her associate attorney, Shane Rogers, has 19 years of experience, and that his rate of $250 per hour is customary for someone of his experience.

Michel then testified generally about preparing the petition, motion practice, depositions legal research, brief writing, and hearing appearances that were necessary over the four years that the underlying matter was pending. She testified that this work was reasonable and necessary for this property tax case, and that this was one of the most extensive property tax cases she has worked on. She testified that they kept monthly billing records of their services and presented partially redacted billing activity records for her firm's fees as an exhibit and testified that the Owners had paid the amounts reflected on those records. Finally, she testified that the work her firm performed was intertwined as it was on behalf of, and for the benefit of, all sixty of the accounts at issue, and for the three years of valuations being challenged.

After the parties rested, the District raised charge objections regarding the sufficiency of the evidence of Owners' attorney's fees. *See In re A.M.W.*, 313 S.W.3d 887, 893 (Tex. App.—Dallas 2010, no pet.) (noting that an issue relating to attorney's fees may be "preserved by objection during testimony offered in support of attorney's fees or an objection to the jury question on attorney's fees."). The District asserted that the billing activity records were not invoices and therefore were not sufficient to demonstrate what fees the Owners paid or incurred.[16]

---

[15] Michel also clarified that some of the Owners' bills reflected her default rate of $400 per hour but that, when she realized the error, she gave the Owners an $8,400 credit to offset the overcharge and thus, the billing records accurately reflect her $300 per hour rate.

[16] The District also objected that there was no evidence to support an award of attorney's fees "because [Owners] did not present evidence of attorney's fees on a per account/per PID basis." We will treat this as a separate issue below.

Now, on appeal, the District has expanded its sufficiency challenge in two ways. First, it asserts that Michel's testimony was conclusory and too general to support a fees award. Second, the District contends that the billing activity records are "heavily redacted and constituted no evidence of attorney's fees." We disagree.

The billing activity reports Michel presented support her testimony and provide sufficient detail for a factfinder to determine the reasonableness of the fees sought. We reject the District's position, as presented to the trial court, that the billing activity reports were not sufficient to support a fees award simply because they were not actual invoices.

> I understand that all we were provided were activity runs from a law firm. We were not provided invoices. What's on an activity run is not the same thing as what a client actually paid or was incurred. So we think that that does not support the legal sufficiency of -- evidence to show a reasonable and necessary fee under *Rohrmoos*.

In *Rohrmoos*, the Supreme Court of Texas reiterated that "[c]ontemporaneous billing records are not required to prove that the requested fees are reasonable." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP,* 578 S.W.3d 469, 502 (Tex. 2019). And, while that Court stated that "billing records are strongly encouraged to prove the reasonableness and necessity of requested fees when those elements are contested," *id*., at no point did the Court state or suggest that such records need be invoices. *See*, *id*. ("In *El Apple*, we acknowledged the value of contemporaneous records for lodestar calculations . . . 'that is, contemporaneous billing records *or other documentation* recorded reasonably close to the time when the work is performed.'") (quoting *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763 (Tex. 2012)) (emphasis added). A review of those records shows that, despite the redactions, there is sufficient detail to support Michel's testimony regarding the reasonableness of the fees incurred.   Additionally, as detailed above, there was direct, uncontroverted testimony from Michel regarding the amount of attorney's fees incurred and paid by the Owners.

Accordingly, we conclude Owners provided the jury with sufficient evidence to support the attorney's fees award.

B. The District's no-evidence challenges based on a purported failure to segregate fees fail.

The District asserts Owners had no evidence to support their award of attorney's fees because they failed to segregate their fees among the individual Subject Properties or for the three separate years of valuations at issue. We disagree.

### *Legal Standard*

A party seeking an award of attorney's fees must segregate the fees between claims for which they are recoverable and claims for which they are not. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). An exception to this duty to segregate arises when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their "prosecution or defense entails proof or denial of essentially the same facts." *Id*. It is only when legal services advance both recoverable and unrecoverable claims that the services are so inextricably intertwined that the associated fees need not be segregated. *Id*. at 313-14. Thus, the general duty to segregate fees applies, unless a party meets its burden of establishing that the same discrete legal services were rendered with respect to both a recoverable and unrecoverable claim. *Id*. at 314; *Thomas v. Goodman*, No. 04-07-00531-CV, 2008 WL 2602120, at *4 (Tex. App.—San Antonio July 2, 2008, pet. denied) (mem. op.) "Under *Chapa*, the determining factor as to whether fees must be segregated is the type of legal services rendered with respect to the particular claims, not simply the manner of pleading or the type of claim pled." *Thomas v. Goodman*, 2008 WL 2602120, at *4 (citing *Chapa*, 212 S.W.3d at 313-14).

### *Analysis*

First, we disagree with the District's contention that it was necessary for the Owners to segregate their fees. *See Transcor Astra Group S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 482

(Tex. 2022) ("[T]he duty to segregate between recoverable and nonrecoverable attorney's fees does not apply when the services for which the fees are incurred 'advance both a recoverable and unrecoverable claim,' such that the 'fees are so intertwined that they need not be segregated.'") (quoting *Chapa*, 212 S.W.3d at 313-14). As noted above, Michel testified that the work her firm performed was intertwined as it was on behalf of, and for the benefit of, all sixty of the accounts, for each of the three tax years at issue. A review of the record gives this Court an understanding of how the issues raised and litigated in the underlying proceeding were intertwined—with basically identical Subject Properties, challenging identical appraised valuations, over three subsequent years—such that the same legal work advanced the Owners' successful challenges to the 2019 and 2020 appraised valuations, and the unsuccessful challenges to the 2018 valuations. For this reason, we conclude the claims are so interrelated that Owners were not required to segregate their fees.

Second, even if Owners were required to segregate their fees, *Abdo*—a decision from this Court that the District points to for support—is clear that the apportioning of fees may be done through counsel's testimony. *See Abdo*, 399 S.W.3d at 255 ("Submitting to the jury an attorney's testimony concerning the percentage of hours relating to specific claims is sufficient to satisfy a party's burden to segregate its attorney's fees."); *see also Tony Gullo Motors*, 212 S.W.3d at 314 ("[a]n opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim."). In this case Michel testified that the matters were intertwined and that her firm's time was split evenly to address the challenged appraisals for each of the three tax years, for each of the sixty Subject Properties.

Q    Now, you testified to the jury that the attorney's fees were intertwined between all 60 subject properties; is that correct?

A    Yes.

. . . .

Q    [Y]our time was evenly split among those 60 subject properties?

A    Yes.

. . . .

Q    Ms. Michel, are you telling this jury that your time, your firm's time spent on this case was divided equally among the three tax years in litigation?

A    Yes.

Accordingly, we reject the District's arguments that the Owners' failure to segregate attorney's fees resulted in no evidence to support the award of attorney's fees.

C.    The property tax rates were properly before the trial court.

The District asserts the trial court abused its discretion when it considered tax rates—necessary for calculating a cap on any attorney's fees awards—that Owners failed to present evidence of at trial. We disagree.

Under section 42.29, a property owner who prevails in a challenge of an appraised valuation, is entitled to reasonable attorney's fees. TEX. TAX CODE § 42.29(a). Any such award, however, "may not exceed the greater of: (1) $15,000; or (2) 20 percent of the total amount by which the property owner's tax liability is reduced as a result of the appeal." *Id*. In a successful challenge to an unequal appraisal under section 42.26(a)(3), the cap under section 42.29(a)(2) is calculated by subtracting the newly determined median appraised value from the District's appraised value, and multiplying the difference by the tax rate published in the District's notices and then calculating a twenty percent of that savings or reduced liability. *Id*.; *see also Abdo*, 399 S.W.3d at 253 (describing this formula).

It is the trial court's duty to perform this calculation and then apply the cap if necessary. *See*, *Abdo*, 399 S.W.3d at 254 ("We believe the trial court not only had the authority, but also had an obligation to calculate the statutory cap on the jury-awarded fee amount.); *see also In re*

*Columbia Med. Ctr. of Las Colinas*, 306 S.W.3d 246, 248 (Tex. 2010) (orig. proceeding) (holding trial court abused its discretion by not reducing punitive damages award in compliance with statutory cap); *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009) (remanding cause to the trial court for it to apply statutory cap to jury's award). Accordingly, the trial court must have the applicable tax rates to perform this calculation.

However, we reject the District's contention that Owners were required to submit these tax rates for 2019 and 2020 as evidence during the trial. The District has provided no authority, nor have we found any, to support its contention that Owners were required to submit evidence of the applicable tax rates prior to the close of trial. Nor do we think that such an approach is warranted given that the calculations required under § 42.29(a)(2) are for the trial court to make, not the jury. To this end, a trial court "may, on its own motion, take judicial notice of adjudicative facts that 'cannot reasonably be questioned.'" *City of Leon Valley v. Martinez*, No. 04-19-00879-CV, 2020 WL 6748723, at *1 (Tex. App.—San Antonio Nov. 18, 2020, no pet.) (quoting TEX. R. EVID. 201(b), (c)). Additionally, "[t]he court may take judicial notice at any stage of the proceeding." TEX. R. EVID. 201(d). Accordingly, we do not find that the trial court erred by applying tax rates it did not receive from Owners until after the jury reached its verdict.

The District's sixth issue is overruled.

## CONCLUSION

Based on the foregoing reasons, we AFFIRM the trial court's judgment.

H. Todd McCray, Justice